PEOPLE v BARCLAY

Docket No. 138671. Submitted March 17, 1994, at Detroit. Decided
    February 21, 1995, at 9:35 A.M.

    Kamania K. Barclay was convicted by a jury in the Recorder's
    Court for the City of Detroit, Leonard Townsend, J., of two
    counts of armed robbery, two counts of assault with intent to
    murder, and one count of arson. The defendant was sentenced
    to concurrent terms of life imprisonment for the armed robbery
    convictions, terms of thirty to sixty years for the assault
    convictions, and a term of 80 to 120 months for the arson
    conviction. The defendant appealed by leave granted.

    The Court of Appeals held:

    1. Because the defendant failed to move for a new trial or
    seek an evidentiary hearing with respect to his claim that he
    was denied effective assistance of counsel, appellate review of
    that claim is limited to the record. The record shows that the
    defendant agreed to be represented at the preliminary exami-
    nation by the same attorney as his codefendant. Trial counsel,
    contrary to the defendant's claim, moved to suppress the in-
    court identification of the defendant. Defense counsel's decision
    not to move for a separate trial did not result in any prejudice
    to the defendant, inasmuch as the defenses were not antagonis-
    tic. Accordingly, the record fails to support the claim of ineffec-
    tive assistance of counsel.

    2. The trial court properly admitted the preliminary exami-
    nation testimony of the complainant who died before trial.
    Defense counsel had the opportunity, and took that opportu-
    nity, to cross-examine the witness at the preliminary examina-
    tion. Accordingly, the defendant's right to confrontation was
    not denied.

    3. The evidence that the defendant and his codefendants
    intentionally had doused with gasoline the candle store that
    they had just robbed and had fled from the store without
    making any effort to make sure that their victims in the store

REFERENCES
Am Jur 2d, Evidence §§ 560, 562.
Admissibility of evidence of lineup identification as affected by
    allegedly suggestive lineup procedures. 39 ALR3d 487.

were safe when an explosion occurred as the result of a lighted candle in the store was sufficient to establish beyond a reasonable doubt the crime of assault with intent to murder.

4. The fact that a witness was unable to identify the defendant at a pretrial corporeal lineup did not render inadmissible the subsequent in-court identification of the defendant by that witness. The prior failure to identify the defendant is relevant to the credibility of the in-court identification, not its admissibility.

5. The reasons articulated on the record by the trial court for imposing sentences that exceeded the sentences calculated under the sentencing guidelines, i.e., that the guidelines range was grossly inadequate and that the victims had been burned badly and were scarred permanently, were not sufficient to justify the court's departure from the recommended sentences. Accordingly, the case must be remanded for resentencing for the armed robbery and assault convictions.

Convictions affirmed, but remanded for resentencing.

E. C. PENZIEN, J., concurring in the affirmance of the convictions but dissenting from the remand for resentencing, stated that the reasons given by the trial court for departing from the guidelines were sufficient and that the sentences imposed were proportionate to the crimes involved. Further, to hold that the sentences were disproportionate and to remand for resentencing without indicating what sentence would be proportionate leaves the trial court without the guidance necessary to impose a proper sentence.

CRIMINAL LAW — IDENTIFICATION TESTIMONY — PRETRIAL IDENTIFICATION — CREDIBILITY.

The fact that a witness was unable to identify a defendant at a pretrial corporeal lineup does not render inadmissible the subsequent in-court identification of the defendant by that witness; the failure to identify a defendant at a pretrial lineup is relevant to the credibility of the in-court identification, not to its admissibility.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training, and Appeals, and *Karen M. Woodside,* Assistant Prosecuting Attorney, for the people.

*George A. Chatman,* for the defendant.

Before: Jansen, P.J., and Holbrook, Jr., and
E. C. Penzien,* JJ.

Jansen, P.J. Defendant was convicted, following
a jury trial in the Recorder's Court for the City of
Detroit, of two counts of armed robbery, MCL
750.529; MSA 28.797, two counts of assault with
intent to murder, MCL 750.83; MSA 28.278, and
one count of arson, MCL 750.73; MSA 28.268.
Subsequently, he was sentenced to concurrent
terms of life imprisonment for the armed robbery
convictions, thirty to sixty years for the assault
convictions, and 80 to 120 months for the arson
conviction. Defendant appeals by delayed leave
granted. We affirm his convictions, but remand for
resentencing.

Defendant first argues that he was denied effec-
tive assistance of counsel. To establish a claim of
ineffective assistance of counsel, the defendant
must show that counsel's performance fell below
an objective standard of reasonableness and that
counsel's representation prejudiced the defendant
so as to deprive him of a fair trial. *People v
Pickens,* 446 Mich 298, 309; 521 NW2d 797 (1994).
Defendant did not move for a new trial or an
evidentiary hearing on this basis below. Failure to
so move forecloses appellate review unless the
record contains sufficient detail to support defen-
dant's claims, and, if so, review is limited to the
record. *People v Armendarez,* 188 Mich App 61,
74; 468 NW2d 893 (1991).

Defendant's first claim, that he was denied effec-
tive assistance of counsel at the preliminary exam-
ination because he and his codefendant were rep-
resented by the same attorney, is not supported by
the record. Our review of the preliminary exami-
nation transcript reveals that defendant specifi-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

cally acknowledged any potential conflict and indicated that he still wished to be represented by that attorney. Defendant cannot now predicate error where he acquiesced to counsel's representation. "To hold otherwise would allow defendant to harbor error as an appellate parachute." *People v Shuler,* 188 Mich App 548, 552; 470 NW2d 492 (1991).

Defendant's other claims also are contradicted by the record. Contrary to defendant's assertion, defense counsel did move to suppress the in-court identification of defendant, but that motion was denied by the trial court. Further, regarding the issue of severance, defense counsel agreed that defendant would be tried before the same jury as his codefendants. Defendant may not assign error on appeal to something that his own counsel deemed proper at trial. *People v McCurdy,* 185 Mich App 503, 507; 462 NW2d 775 (1990). In any event, we find that the defenses were not antagonistic because codefendant Lodrick Parker's statement to the police did not incriminate defendant. Defendant was not entitled to a separate trial. *People v Harris,* 201 Mich App 147, 152-153; 505 NW2d 889 (1993). Accordingly, on the basis of the record before us, defendant was not denied effective assistance.

Defendant next argues that the admission of the deceased complainant's preliminary examination testimony at trial violated his right to confrontation. We first note that defendant did not object to the admission at trial of the preliminary examination testimony of Charles Byrd, except for that portion of the testimony concerning Byrd's identification of defendant as a participant. Therefore, this issue is reviewed only to the extent that a substantial right of defendant's was affected. MRE 103(a)(1). Because Byrd was deceased at the time of

trial, his preliminary examination testimony was admissible. MRE 804(b)(1). Further, the preliminary examination transcript reveals that defense counsel had the opportunity to cross-examine Byrd and exercised the opportunity to do so. Defendant's right to confrontation was not denied.

Defendant next argues that there was insufficient evidence to support his convictions of assault with intent to murder. When determining whether sufficient evidence was presented to sustain a conviction, a court must review the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wolfe,* 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).

The elements of assault with intent to murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *People v Warren (After Remand),* 200 Mich App 586, 588; 504 NW2d 907 (1993). Circumstantial evidence and reasonable inferences arising therefrom may constitute satisfactory proof of the elements of the offense. The intent to kill may be proven by inference from any facts in evidence. *Id.*

Taken in a light most favorable to the prosecution, we find that there was sufficient evidence to sustain defendant's convictions of two counts of assault with intent to murder. The evidence revealed that defendant and his two codefendants entered a religious candle shop on January 11, 1990, in the City of Detroit. Codefendant Parker ordered the cashier, Geraldine Anderson, at gunpoint to open the cash register and lie on the floor. Defendant then doused the store with gasoline. Both people in the store were ordered to lie down and avert their eyes. Because there were several

burning candles at the time, an explosion ensued before defendant or his codefendants actually lit the gasoline. However, the gasoline was poured intentionally throughout the store, and, after the explosion, defendant and his codefendants fled from the store and did not make any effort to see that the two people in the store were safe. The two victims in the store were badly burned.

On the basis of defendant's actions in intentionally pouring gasoline in the store, knowing that there were lit candles in the store, and in fleeing from the store immediately after the explosion, we find that the elements of assault with intent to murder, including the intent to kill, were proven beyond a reasonable doubt.

Defendant next argues that he was denied a fair trial because of the trial court's failure to sever his trial from that of his codefendants. However, defense counsel agreed before trial that severance would not be necessary. As we have stated, defendant may not assign error on appeal to an act that his own counsel deemed proper at trial. *McCurdy, supra,* p 507.

Defendant next claims that the trial court erred in failing to suppress the in-court identification of defendant by Byrd. The trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous. *People v Kurylczyk,* 443 Mich 289, 303; 505 NW2d 528 (1993). A decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.*

The need to establish an independent basis for an in-court identification arises where the pretrial identification is tainted by improper procedure or is unduly suggestive. *People v Laidlaw,* 169 Mich App 84, 92; 425 NW2d 738 (1988); *People v Syakovich,* 182 Mich App 85, 89; 452 NW2d 211 (1989).

At no point has defendant argued that the lineup procedure was improper or unduly suggestive. Rather, defendant's argument is premised on the fact that Byrd did not identify defendant at a pretrial corporeal lineup, but identified him in court (at the preliminary examination) as the man who poured the gasoline in the store. The fact that Byrd did not identify defendant at the lineup did not render his subsequent in-court identification inadmissible. *Id.* Rather, this was a credibility issue that was properly before the jury to determine. The trial court did not commit clear error in allowing the in-court identification testimony.

Finally, defendant argues that his sentence violates the principle of proportionality. Although defendant does not argue specifically whether his sentences for the assault convictions or the armed robbery convictions violate the principle of proportionality, our review of the record leads us to conclude that defendant's sentences for both armed robbery (life) and assault with intent to murder (thirty to sixty years) violate the principle of proportionality. *People v Milbourn,* 435 Mich 630, 636; 461 NW2d 1 (1990).

The recommended sentences under the sentencing guidelines for the assault convictions were seven to fifteen years. The trial court exceeded the guidelines range, stating that the range was grossly inadequate and that the victims were burned badly and were scarred permanently. Although lengthy sentences for both the armed robbery and assault convictions may be warranted in this case, we find that the trial court's reasons for exceeding the guidelines range were not sufficient in light of the substantial departure. Further, the trial court failed to complete a Sentencing Information Report (SIR) departure form. *People v Fleming,* 428 Mich 408, 428; 410 NW2d 266 (1987).

Accordingly, we remand this case for resentencing with regard to the armed robbery and assault convictions. Should the trial court exceed the guidelines range, it must articulate both on the record and on the SIR factors not included within the guidelines range or factors not accounted for adequately by the guidelines. *Fleming, supra,* p 428; *Milbourn, supra,* pp 657, 660.

Defendant's convictions are affirmed, but the case is remanded for resentencing with respect to the convictions of armed robbery and assault with intent to murder. We do not retain jurisdiction.

HOLBROOK, JR. J., concurred.

E. C. PENZIEN, J. *(concurring in part and dissenting in part).* I agree that the defendant's convictions in this cause should be affirmed. I respectfully disagree with the majority's decision to remand this case for resentencing. I further am of the opinion that when an appellate court remands a case for resentencing on the theory that the sentence imposed is lacking in proportionality, the appellate court is duty-bound to state the limits of proportionality as viewed by the appellate court.

### REVERSAL REQUIRES GUIDANCE

The majority has concluded with very little discussion that the sentence imposed by the trial court in this case is lacking in proportionality. Clearly, the majority does not conclude that the sentences were too short. The majority concludes that the sentences were too long to be proportional. This is a pronouncement of law, not an exercise of discretion. If the majority, in fact, knows as a matter of law that the sentences are too long to be proportional, then it must know how long is too long.

By refusing to set forth in its opinion the upper limit of proportionality in this case, the majority (along with the panel of almost every other appellate opinion in this area) avoids its responsibility to state the law applicable to this case and makes impossible of attainment one of the goals the Supreme Court enunciated in *People v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990), i.e., to reduce from previous levels the subjectivity of the standards of appellate review of sentences.

When an appellate court refuses to enunciate the upper or lower limits of proportionality of the sentence in a particular case, the court merely fosters a continuation of the subjective standards previously utilized in appellate review of sentences. The majority does not articulate its reasons for believing that the sentences in this case are lacking in proportionality, because it cannot articulate those reasons. The process is, by its nature, subjective, and the only way in which subjectivity can be reduced is by the process of appellate court opinions stating precisely what are the upper and lower limits of proportionality in cases with specific facts.

The process of simply remanding for resentencing, without a statement concerning the limits of proportionality in an individual case, does a grave disservice to the victims of crime, to the taxpayers who must fund endless sentencing and appellate proceedings, to the process itself, and to the public's interest in maintaining a judiciary in whom the public may continue to have confidence.

Every time the victim is compelled to appear in court and to be concerned about the finality of the judicial process involving an assailant, the victim suffers enormous emotional torment. If it is necessary that the victims be tormented further because the law has not been obeyed, it is not unreason-

able to expect the appellate courts to state precisely what the law is. The law cannot be stated precisely in this area without a statement of the upper limit or lower limit of proportionality of the sentence in the given case.

The majority remands this case to the trial court for resentencing without the least bit of guidance to assist the trial court in determining what this appellate panel or some other appellate panel will consider to be proportional. Clearly, the trial court thought it was imposing a sentence proportional to the crime and the defendant. Indeed, this writer believes that it would be virtually impossible to find a majority of citizens in any community in this state who would believe that the sentences imposed in this case were too long, given the horrendous nature of the crimes and the utter contempt for human life and suffering displayed by this defendant.

What, then, is the trial court in this case to do on resentencing. Obviously, it must cast out its previously conceived concepts of proportionality because, by order of this Court, its previous concept of proportionality has been ruled unlawful. The majority of this panel of this Court has spoken, and obedience to its order is both proper and in the complete interest of an ordered society. However, without guidance from this Court with respect to what is proportional, the bewildered trial court must cast about for some standard unknown to it. It is left essentially to guess, to conjecture, to speculate, and, finally, to consider factors that are utterly foreign to a proper determination of the case, such as whether it should impose a sentence low enough so that the victims can be spared further torment at the hands of the state.

Giving consideration to the further torment of

the victims, trial courts are driven to impose a
sentence sufficiently low that no appellate court
could conceivably think it to be disproportionate.
If a trial court rejects that approach, it is abso-
lutely without boundaries or adequate guidelines.
Slavishly following the sentencing guidelines is not
an appropriate response. As the trial court noted
in this case, the guidelines are "grossly inade-
quate" to the task presented by this particular
case. If the trial court rejects slavish obedience to
the sentencing guidelines, it will find itself again
without any guidelines that will tell it what the
law requires under the facts of this particular
case. It will again exercise its best judgment, and
it runs a fifty-fifty chance of further appellate
reversals. The case may be assigned to another
panel of the Court of Appeals, and that panel will
again exercise its unfettered instincts of propor-
tionality. If the second round of appeals results in
yet another reversal with yet another opinion
finding lack of proportionality but without specific
limits, the Court of Appeals in all likelihood will
remand the case for resentencing before another
judge.

If the new judge's opinion with respect to pro-
portionality is similar to that of the previous
judge, yet another appellate reversal is at least as
likely as not. At each round, it becomes more and
more likely that the sentencing court will consider
the torment suffered by the victim by the endless
rounds of appeal and reversal and make sure that
the defendant is released at a sufficiently early
date to meet anyone's standards. The concept of
proportionality thus is replaced by the concept of
the lowest common denominator. The victim's tor-
ment will be no less, but at least the victim will no
longer be called to court harboring some false
hope that justice will be done.

The cost of this endless round of appeals must be borne by someone. Because there is no limitless revenue stream in any system, the unnecessary allocation of funds to one process compels the unnecessary rationing of funds for another. Every dollar expended for attorneys on both sides, for the operation of courts, the preparation of transcripts, the preparation of new presentence reports, and the many other costs involved in the process of endless resentencing and appellate review is a dollar that is not available for health care, for education, for economic expansion, for housing, feeding, and clothing the poor and helpless, for cleaning our heavily tarnished environment, for prevention of crime, and for other worthy and needy purposes, It is well and good for an appellate court to substitute its unfettered judgment of proportionality for that of the fettered judgment of the trial judge. That is the law of this state as currently promulgated by the Michigan Supreme Court. But to do so in a fashion that needlessly wastes vitally needed resources is both unnecessary and unwise.

Our Supreme Court as leader of our one court of justice has expended considerable efforts to promote a favorable public perception of the judiciary. Sentencing guidelines are indeed one part of that effort. The rule announced in *Milbourn* is another. In the judgment of this writer, nothing can destroy more quickly a favorable public perception of the judiciary than for a judge to say "I know what the law is, but I will not tell." By refusing to state what the upper limits of proportionality in this case are, the majority is saying to the trial court, "You have made a mistake. You must do it again, but you must guess. We will not tell."

## THE SENTENCE WAS PROPORTIONAL

The defendant in this case went with two others

to a store in broad daylight. They were armed with guns. Clearly, part of the plan was to take any money found in the store and to rob at gunpoint any person found in the store. For the mere purpose of gaining control over somebody else's money, the defendant and his confederates also clearly planned to avoid apprehension for their offense by burning alive all present in the building. There, of course, exists the other reasonable hypothesis that the defendant and his associates were engaging in these activities purely for personal enjoyment. To whichever end, the defendant and his confederates carried cans of gasoline into the store and spread it around after completing their robberies. By chance, the gasoline was ignited before the defendants could set it afire when its fumes reached a burning candle. The defendant was burned mildly in the process. His two victims were burned alive. They did not die in the flames, but they were scarred and maimed for life. The defendant's cold-hearted attitude toward these victims and others who might have been there continues, as far as the record in this case shows, to this day. When apprehended, the defendant did not rest simply on his constitutional rights to remain silent. He boldly lied about his involvement. So far as this record shows, he has never expressed the slightest remorse for his action or the slightest concern about the welfare of his victims.

One of the victims, who was permanently disfigured and lost the use of his hands, subsequently was murdered, and his torment in this world ended so that he will not have to attempt to comprehend why thirty years in prison is considered a disproportionately long sentence for the crime committed against him. The other victim continued to be in great pain at the time the

presentence report was prepared, more than ten months after the crime. She had suffered numerous skin grafts. She had been hospitalized for three months, followed by daily nurse visits for six weeks. She had been fitted for an acrylic face mask and gloves, and her heart problems had worsened. This victim has not died and will be required to attempt to comprehend not only why her plea that the defendant should never get out of prison should fall on deaf ears, but also why the trial court has been determined to have violated the law by imposing a sentence of thirty years and a sentence of life for one of the most heinous crimes imaginable.

It is not surprising that the majority fails to articulate its reasons for concluding that these sentences violate the principle of proportionality. The defendant's counsel was reduced to the recitation of platitudes in his effort to do so. That is not because appellate counsel or the majority are inarticulate. It is because it is impossible to articulate why something is or is not proportional when there is no adequate guide. Under presently existing legal requirements, the only adequate guide can be the recitation of particular facts and the determination with respect to specific limits of proportionality in a series of reported cases. Once that body of law has been established, then we will be able to articulate why something is or is not proportional.

The majority comments that the trial court's reasons for exceeding the guidelines' range were not sufficient in light of the substantial departure. However, the majority is clearly saying more than that a better articulation would result in affirmance. The majority has said that under no circumstances can this defendant receive a sentence like that which he did receive for the crimes that

he committed. It may, therefore, seem of little assistance to comment on the guidelines here. However, a little assistance may be better than none.

The trial court said that the guidelines as applied to the peculiar facts of this case were "grossly inadequate." It is difficult to conceive of a better description. The guidelines were most assuredly grossly inadequate to the task of defining a proportional sentence for this particular case. The guidelines may be helpful in many cases, but there are, mercifully, not many cases like the one at bar.

The trial court here was compelled to score the guidelines for assaults, a range of activity that is extremely broad. The fact that the court was required to use the assault guidelines was merely a matter of chance. It was clearly the defendant's plan to hold at gunpoint everybody in the store until their money and the store's money could be taken, after which they were to be burned alive until they were dead. Their deaths were prevented by the bravery of an off-duty police officer who risked his own life to save the lives of the defendant's intended murder victims. If the defendant's plan had been carried out as he wished, the trial court would have been scoring on a homicide guideline. Depending on what view the court took of the facts, the defendant would have received an offense variable score of between 190 and 205 points. The offense variables go off the grid at fifty points. Thus, the defendant's offense variable points would have been approximately four times the maximum offense variable points used in computing the guideline. In addition, as noted below, Prior Offense Variable 7 would have been scored twenty points. The grid would have proposed a guideline of 144 months to 300 months or a life sentence. In this case, the trial court imposed a

minimum of 360 months with respect to two of the offenses and life sentences with respect to the other two.

The offense of assault with intent to murder, which requires the judge to score pursuant to the assault guidelines, requires no injury whatsoever. It can be established even if the defendant makes the assault but changes his mind and decides not to carry out his intent. In the case at bar, the defendant's actions made his crime actually much more like the crimes that generally fall into the homicide grid. He did everything possible to bring himself into that grid. He was simply unsuccessful because of pure chance, and a very slim chance at that. What, indeed, are the chances that a passerby coming by that store at that particular moment would have the presence of mind and the unbounded courage and the training to enter a raging inferno to save the lives of fellow human beings.

Certainly, the life sentences imposed here do not fall outside the homicide guidelines, and the modest twenty percent departure on the term of years guides easily is justified. For example, the homicide offense variables score twenty-five points for aggravated physical injury, but they give absolutely no consideration to the kind of injuries imposed here, which is to say burning alive. They give no consideration at all to the torment the victims had to suffer before they were burned by being held at gunpoint while they smelled the odor of the gasoline being spread around the store. They give no consideration to the fact that this was a crime well planned in advance or that the defendant conspired with others to commit the crime, that he had no concern for what happened to the victims, and that he had boldly lied about his participation in the events, and they give no

consideration to the grievous pain, suffering, and emotional torment suffered by the victims, or to the fact that the defendant clearly would have killed or tried to kill anyone else who was present in the store at the time.

Turning to the guidelines specifically applicable to this case, the assault guidelines, examination discloses that the trial court was quite correct in describing the guidelines as "grossly inadequate" to the task presented. It should first be noted that the trial court scored the guidelines modestly, indeed. For example, he might very well have scored OV 2 as fifty points for excessive brutality rather than twenty-five points for undescribed bodily injury. However, either way the scoring went, the defendant went off the Offense Variable grid. The trial court scored him at fifty-five Offense Variable points whereas it might well have scored him at eighty points.

Also, the trial court scored the defendant zero points under PRV 7, although the guidelines provide that a person convicted of two or more felony counts should be scored twenty points under PRV 7. This failure could not affect the sentence in this case, because the grid maximum does not change.

In the scoring of PRV 7, the guidelines give no consideration whatsoever to the nature of the multiple convictions. The guidelines provide for an identical PRV 7 scoring whether the concurrent or subsequent conviction is for murder or for uttering and publishing an insufficient funds check. Thus, these guidelines give no reasonable consideration whatsoever to the fact that the defendant committed two armed robberies, two assaults with intent to murder, an arson, and perhaps other felonies all at the same time.

The assault guidelines provide for a score of fifteen points because the defendant carried a

firearm and pointed it toward one of his victims. But they give no consideration whatsoever to the fact that the defendant also carried a can of gasoline with the intent to burn up his victims.

The assault guidelines provide for a scoring of points for bodily injury, for subjecting a person to terrorism, or for treating a person with excessive brutality, but they give no points or no consideration to the specific facts that the defendant tried to kill his victims, that he tried to do so in one of the most heinous ways possible, that the victims were subjected to the horrifying experience of helplessly waiting to be burned alive, and that the victim who survived must endure pain the rest of her life. Myriad other results of the defendant's acts could be cited. For example, what is the effect of these acts on those who love the victims. The guidelines care not.

The assault guidelines give ten points for the involvement of two or more victims. They provide for a score of one hundred points where there are two or more deaths. But there is little moral difference between having two or more deaths and having two or more persons who almost are burned to death and would have been burned to death but for the slim chance that prevented it in this case.

The assault guidelines provide points for being a leader in a multiple offender situation, but they give no points for being an eager and equal participant.

The assault guidelines give consideration for bodily injury, but they make no differentiation between a small scratch and being maimed, horribly disfigured, and tormented for life.

The assault guidelines give no consideration to the fact that the defendant participated eagerly in this well-thought-out plan. They give no considera-

tion to the fact that the defendant boldly lied about his involvement and showed no concern whatsoever for the grievous and horrible injuries inflicted on his victims. They give no consideration whatsoever to the fact that the defendant intended to kill whoever fell under his shadow. These are but some of the concerns that are not reflected in the guidelines, and clearly there are others.

The trial court said the guidelines were "grossly inadequate" to assist in the task presented to it. It is possible that the trial court could have used more words to describe the reasons for departing from the guidelines. It could not have been more accurate.

If it were not for the respected opinion of my colleagues on this panel, I would not have thought that the sentences imposed in this case were even arguably disproportionate.

I would affirm the defendant's convictions and his sentences.