# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 3, 2015

Plaintiff-Appellee,

v

No. 317683
St. Clair Circuit Court
LC No. 12-002248-FC

GREGORY CYPRIAN VANNESTE,

Defendant-Appellant.

Before: JANSEN, P.J., and TALBOT and SERVITTO, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of first-degree criminal sexual conduct ("CSC I"), MCL 750.520b (sexual penetration, victim between the ages of 13 and 16 and member of the same household), kidnapping, MCL 750.349, and two counts of second-degree criminal sexual conduct ("CSC II"), MCL 750.520c (sexual contact, victim between the ages of 13 and 16 and a member of the same household).[1] The trial court sentenced defendant to concurrent prison terms of 225 months to 30 years for the CSC I and kidnapping convictions and 10 to 15 years for the CSC II convictions. We affirm.

## I. FACTS

## A. THE CRIME

AJ, the victim, was 15 years old at the time of the incident. She lived with her mother and defendant, her mother's boyfriend, in defendant's home. Her sisters SJ and LV also lived in the home. On August 31, 2012, AJ was alone in the home. Defendant was to pick up AJ from his home and take her to her maternal grandfather's home. According to AJ, when defendant arrived, she spoke to him briefly in her upstairs bedroom. The two went to the home's main floor. Defendant suddenly grabbed AJ by the arm and forced her into his bedroom, where he

---

[1] Defendant was first tried in April, 2013. This trial resulted in a hung jury. Defendant's second trial was held in June 2013, and resulted in defendant's convictions. Defendant was acquitted of felonious assault, MCL 750.82, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.

sexually assaulted her for approximately three hours. He placed a revolver at AJ's head during the assault. Defendant wore condoms at various points during the assault, and completed his assault by ejaculating on AJ's stomach. Once he ended the assault, defendant forced AJ to shower and change the bed linens. Defendant then drove AJ to her grandfather's home. According to AJ, defendant stated "that he was scared to go to jail" during the drive. After defendant dropped AJ off and left the home, AJ told her grandfather that she had been raped. Police were called immediately, and AJ was taken to a local hospital.

Officer William Myles ("Myles") and another officer stopped defendant in his vehicle shortly thereafter. Upon searching defendant's vehicle, officers found a revolver in the glovebox. Defendant consented to a search of his home. Myles and Trooper Rick Sebring ("Sebring") searched the home. The home was covered in garbage and dog feces, and smelled strongly of urine; the basement was covered with wet, dirty clothes. There were no linens on defendant's bed, but blankets and linens were found in the clothes washer and dryer in the basement, along with girl's clothing and a pair of men's underwear. Defendant explained this by telling the officers that one of his dogs had urinated on the bed, AJ, and himself. However, Sebring found no odor of urine on the bed, and felt no dampness.

The medical examination of AJ found injuries consistent with forced vaginal penetration. Swabs were taken and sent for further analysis. These swabs tested positive for seminal fluid, and were sent for DNA analysis. The first DNA analysis found insufficient data to positively identify defendant as the source of the seminal fluid. However, the available data matched defendant's DNA profile. A second analysis, the Y-STR analysis, examined the Y-chromosome only. This analysis found a perfect match between the seminal fluid found and defendant's DNA profile. However, because this test only looks at the Y-chromosome, it cannot positively identify any particular individual as the source of the seminal fluid. Because the Y-chromosome is passed from father to son without alteration, all of defendant's male relatives would share this same chromosome.

Defendant was interviewed by Sebring. During the interview, defendant maintained that one of the dogs had urinated on the bed, himself, and AJ. He explained that he directed AJ to give him her clothes and to take a shower, which she did. He claimed that he did the same after AJ finished showering, and that he asked AJ to help remove the bed linens so they could be washed. He denied having sex with AJ. Sebring told defendant that he found the story unbelievable, given the condition of the house, and considering that defendant's girlfriend was hospitalized. He asked defendant how it was possible that AJ would have semen on her stomach matching defendant's DNA. Defendant explained that he had sex with AJ's mother that morning or the day before in the bathroom. He explained that AJ's mother was menstruating at the time, and that he used a bath towel to clean up afterwards. Defendant stated that he hung the bath towel up in the bathroom afterwards, and that AJ could have used the towel after her shower. Sebring expressed his disbelief of defendant's story and ended the interview. Defendant was transported by car to jail. During this drive, defendant made a few spontaneous utterances, including expressing his love for AJ's mother and fear that "she would not love him no more for what he had did." Upon approaching the jail, defendant asked "what people would do, what people do in jail to people that commit crimes like this[.]"

Defendant testified that when he arrived at his home, three young men were running from the house. He claimed to have told Sebring about this during his interview, but that Sebring failed to mention it in the report. Defendant ran inside the home and found AJ lying on her bed with her pants partially removed. Defendant claimed he tried to talk to AJ about what happened, but that she would not talk to him, so he decided to let her mother handle the situation. He asked AJ to let the dogs out from the basement. She did so, and one of the dogs urinated on defendant's bed, on defendant, and on AJ. Defendant again explained that he and AJ started washing the affected clothing and bed linens, showered, and left for her grandfather's home.

Defendant explained that he always carried a revolver, and that the revolver had been in his glovebox the entire day. He denied having made incriminating statements during the drive to jail. He denied that the sexual assault occurred. He also explained that AJ had watched the movie, "The Crush," in which a daughter frames her mother's boyfriend for sexual assault by obtaining his DNA. Defendant then explained that his family had a long history in the area, and that he "can't go anywhere without" seeing a relative. He claimed that two of the three young men he saw running from the home were related to him. He named one but could not remember the name of the other. However, the prosecutor called a rebuttal witness. This witness was employed with a local juvenile detention center. He testified that the individual named by defendant was being held at the juvenile detention center on the day of the assault.

## B. MOTION FOR DISCLOSURE OF PRIVILEGED INFORMATION

Before his first trial, defendant's attorney filed a motion for disclosure of privileged information pursuant to MCR 6.201(C). The trial court agreed to review the records. After reviewing the records, the trial court disclosed a single document containing a report related to an argument between AJ and defendant.

Before defendant's second trial began, defense counsel moved for reconsideration of the order, explaining that he believed the psychological records contained evidence of "extreme mental illness such that it could affect things like the ability to tell the truth and things of [that] nature." The trial court denied the motion. On the third day of trial, defense counsel again raised the issue. Defense counsel explained that the day before, defendant informed him that a CPS report contained a threat by AJ's sister, SJ, to falsify sexual assault allegations against defendant. He argued that the threat was relevant to demonstrate a conspiracy or plan between AJ and SJ to eliminate defendant from their lives. The trial court agreed to review the records. Shortly thereafter, the trial court found the report, and after excusing the jury, disclosed it to the parties. Defendant asked that he be allowed to introduce the report, to call SJ as a witness, and to call the CPS worker as a witness. The prosecutor argued that the threat was irrelevant and asked the trial court to "weigh out that relevance in terms of the confusion of issues to the jury, the prejudice to the jury . . . ." The trial court ruled:

> It doesn't involve [AJ]. And it's two years prior to these allegations. And there is no indication anywhere that this was an idea that was placed in her mind by her sister. There is no indication anywhere in this voluminous record that she and her sister have discussed at in any point in time, that it's an idea that she got from her sister.

I believe that whatever value it has it would be outweighed by the prejudice it would create in this case, and I'll not allow that information to be directly presented to the jury by way of testimony from [SJ] or any other individual that may have interviewed her.

What I'll allow is the cross-examination and examination of the victim of this case or complainant, if you will, as to were there any conversation[s] she may have had with her sister about such topics. Has there ever been a discussion in the past, including back in 2010 about [defendant] being a rapist or that was a point of description for him or not. I'll give you full latitude in that area.

During defense counsel's cross-examination of AJ, the following colloquy occurred:

*Q.* You weren't ever aware of anything [SJ] ever did that would try to break your mother and [defendant] apart?

*A.* No.

*Q.* [AJ], were you ever aware, ever, did you ever gain any knowledge about [SJ]'s thought to claim [defendant] was going to rape her in order to split your mother and father up?

*Ms. Deegan (The Prosecutor):* Your Honor, I am going to object. If we may approach?

*The Court*: She's already stated she wasn't aware of anything. She's answered that question.

*The Prosecutor*: I think the Court made a ruling with regard to some of these things. I would ask that the question be stricken for the record, please.

*The Court*: Very well. Move along.

*Mr. Rubin (Defense Counsel):* Judge, I think I need to have some clarification on this because I might have misunderstood the Court's ruling.

*The Court*: You can ask her if she is aware of anything and having personal conversation about that. Go ahead

Defense counsel then asked AJ if she was aware of any prior discussions by SJ during which she stated that she would allege defendant "did something to her[,]" if either AJ or SJ had referred to defendant as a rapist, if she had ever witnessed SJ "act out a situation where she was claiming to be raped[,]" or if she had ever "act[ed] out being raped[.]" AJ responded in the negative to every question.

## II. DISCUSSION

### A. DISCOVERY OF PRIVILEGED INFORMATION

-4-

Defendant first argues that the trial court abused its discretion by failing to disclose SJ's threat in response to his first motion, and for failing to disclose evidence of AJ's mental illnesses. We disagree. A trial court's ruling regarding whether records are discoverable or protected by privilege is reviewed for an abuse of discretion. See *People v Stanaway*, 446 Mich 643, 680; 521 NW2d 557 (1994). An abuse of discretion occurs when the trial court reaches a result outside the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

Defendants generally are prohibited from discovering privileged information. MCR 6.201(C)(1). But "[i]f a defendant demonstrates a good-faith belief, grounded in articulable fact, that there is a reasonable probability that records protected by privilege are likely to contain material information necessary to the defense, the trial court shall conduct an in camera inspection of the records." MCR 6.201(C)(2). Pursuant to MCR 6.201(C)(2)(b):

> If the court is satisfied, following an in camera inspection, that the records reveal evidence necessary to the defense, the court shall direct that such evidence as is necessary to the defense be made available to defense counsel. If the privilege is absolute and the privilege holder refuses to waive the privilege to permit disclosure, the trial court shall suppress or strike the privilege holder's testimony.

However, "when a discovery request is made[,] disclosure should not occur when the record reflects that the party seeking disclosure is on 'a fishing expedition to see what may turn up.'" *Stanaway*, 446 Mich at 680, quoting *Bowman Dairy Co v United States*, 341 US 214, 221; 71 S Ct 675; 95 L Ed 879 (1951).

Defendant first argues that the trial court abused its discretion by failing to disclose the report containing SJ's threat at the time it first reviewed the records, and that the trial court's failure to do so prevented defendant from fully investigating the issue. However, when defendant first asked the trial court to review the records, he mentioned two general topics for which he was seeking information: alleged reports of sexual abuse made to CPS that were found to be unsubstantiated, and information from AJ's psychiatric records regarding her apparent hatred for defendant. Defendant made no mention of any threats by SJ to make false allegations; nor did he reveal any intention to pursue a theory that AJ and SJ conspired to falsify sexual-abuse allegations against him. Clearly, defense counsel himself was only made aware of SJ's threats the day before his request. The trial court did not abuse its discretion by failing to disclose information at a time when defendant made no indication that he considered the information relevant.

Defendant's second argument is that the trial court erred by failing to disclose information regarding AJ's alleged extreme mental illness. In the trial court, defendant suggested two areas in which AJ's mental illness could be relevant: (1) as an explanation for her hatred for defendant, and (2) because her mental illness could affect her ability to tell the truth. However, regarding the first area, defense counsel only explained that he believed that AJ had an irrational hatred for defendant which would be "discussed in [her] psychological records." Regarding the second area, defense counsel explained that he felt AJ suffered from an unidentified "extreme mental illness" that "could affect things like the ability to tell the truth and

things of that nature." Clearly, defendant was merely on a fishing expedition, hoping to find that his beliefs might be substantiated by the privileged information he sought to discover. In such a case, he was not entitled to discovery. *Stanaway*, 446 Mich at 680.

Further, we have searched the records provided by the trial court. The information defendant hoped to find does not exist in the records. Accordingly, the trial court did not abuse its discretion by refusing to allow defendant access to AJ's psychiatric records. See MCR 6.201(C)(2)(b) (the trial court need only disclose records if it is satisfied "that the records reveal evidence necessary to the defense").

## B. REFUSAL TO ADMIT EVIDENCE PURSUANT TO MRE 403

Defendant next argues that the trial court abused its discretion by refusing to allow him to introduce evidence of SJ's threat to make false sexual-assault allegations against him. We disagree. A trial court's evidentiary rulings are reviewed for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "However, decisions regarding the admission of evidence frequently involve preliminary questions of law, e.g. whether a rule of evidence or statute precludes admissibility of the evidence. This Court reviews questions of law de novo." *Id*. Finally, even if an evidentiary error occurred, defendant's conviction may not be set aside unless it is more likely than not that the error was outcome-determinative. MCL 769.26; *Lukity*, 460 Mich at 495-496.

The issue raised by defendant is not, as he attempts to frame it, one of constitutional magnitude. Defendant asserts that the trial court's decision that evidence of SJ's threat was inadmissible denied him his constitutional rights to present a defense and to confront the witnesses against him. The trial court's ruling that defendant could not present evidence of SJ's statement during her CPS interview was an evidentiary ruling, premised on MRE 403. "Evidentiary errors are nonconstitutional." *People v Blackmon*, 280 Mich App 253, 259; 761 NW2d 172 (2008). Further, the constitutional right to present a defense is "not unlimited and is subject to reasonable restrictions." *People v King*, 297 Mich App 465, 473; 824 NW2d 258 (2012). Likewise, defendant's right to cross-examination is not absolute, and remains subject to "legitimate interests of the trial process or of society." *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). "[N]either the Confrontation Clause nor due process confers an unlimited right to admit all relevant evidence or cross-examine on any subject." *Id*. Defendant was required to comply with the rules of evidence, and these rules did not infringe upon his constitutional rights unless the rules were arbitrary or disproportionate to the purposes the rules are designed to serve. *King*, 297 Mich App at 474. Defendant makes no argument that the evidentiary rule at issue, MRE 403, is arbitrary or disproportionate. Accordingly, he has abandoned his claims of constitutional error. See *King*, 297 Mich App at 474.

Even if we were to consider defendant's argument as raising constitutional issues, we would find defendant's claim without merit.[2] A defendant's right to present a defense is not

---

[2] Because defendant raised no constitutional challenges in the trial court, we would review the issue for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597

-6-

violated if the defendant is able to present his theory despite the exclusion of evidence. See *People v Herndon*, 246 Mich App 371, 411; 633 NW2d 376 (2001). Generally speaking, defendant's theory was that AJ fabricated her allegations. Defendant hoped to demonstrate this theory by presenting evidence that AJ and SJ conspired to fabricate allegations against him. Defense counsel was permitted by the trial court to question AJ regarding whether she was aware of SJ having done anything aimed at splitting defendant and her mother apart, whether she knew of any conversations with SJ regarding false allegations of sexual assault, and whether she or SJ had ever referred to defendant as a rapist. Counsel was also allowed to question AJ at length regarding her hatred of defendant and whether this caused her to try to split her mother and defendant apart. The trial court permitted defendant to pursue his theory, and accordingly, did not deny him the right to present his defense. *Id*. Regarding his right to cross-examination, a careful reading of the transcript reveals that the trial court did not, as defendant alleges, sustain the prosecutor's objection to defendant's question to AJ or strike the question from the record. After the prosecutor's objection, the trial court stated only that AJ had already answered the question. When the prosecutor asked that the response be stricken "for the record," the trial court acknowledged that the prosecutor had made the request, but did not strike the testimony.

Rather, the issue is whether the trial court abused its discretion by refusing to allow defendant to introduce SJ's statements, contained in the CPS report, threatening to make false sexual-assault allegations against defendant. The trial court's decision to prohibit defendant from introducing this evidence was not an abuse of discretion. Pursuant to MRE 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Under this rule, " '[e]vidence is not inadmissible simply because it is prejudicial.' " *People v Blackston*, 481 Mich 451, 482; 751 NW2d 408 (2008), quoting *Waknin v Chamberlain*, 467 Mich 329, 334; 653 NW2d 176 (2002). Nor does MRE 403 permit exclusion of evidence simply because the evidence might harm one party's case. *Blackston*, 481 Mich at 482. " '[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403 . . . .' " *Id*. at 483, quoting *Waknin*, 467 Mich at 334. "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998). See also *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). "The trial court is in the best position to gauge the effect of such [evidence]." *People v Ackerman*, 257 Mich App 434, 442; 669 NW2d 818 (2003). "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*.

SJ's threat had minimal, if any, relevance to the case, and could have been given undue weight by the jury. The threat was not made by AJ. There was no evidence that AJ was aware of the threat. There was also no evidence that AJ and SJ conspired or acted together to frame defendant. The threat was made more than two years before the incident at issue in this case. The threat was also made by a child, approximately 11 years old, who was clearly upset with her

NW2d 130 (1999). To warrant relief under this standard, defendant must demonstrate that an error occurred, that the error was plain, and that the error affected the outcome of the proceedings. *Id*.

mother, defendant, and other family members at the time. And the evidence was only of a threat, not of an actual plan or effort to put the threat into action by SJ, much less by AJ. On the whole, the trial court did not abuse its discretion by refusing to admit the evidence. While the question was perhaps a close one, the trial court was in the best position to judge the effect of this evidence, and its decision on a close evidentiary question cannot be considered an abuse of discretion. *Id*.

Even if the trial court had erred by excluding the evidence, such error would be harmless. As discussed, SJ's threat was of marginal probative value. Further, it was made known to the jury that AJ had a potential motive to falsify her allegations. AJ herself testified that she hated defendant. She testified that she made it known to many people that she hated defendant, including family members and school counselors. She admitted to writing her hatred of defendant on the walls of his home. She testified that she talked about wanting defendant to die. She admitted to drawing pictures of him burning. She testified that she hated defendant because he was dating her mother, and that she wanted her mother to be with AJ's biological father. Defendant was also given the opportunity to question AJ regarding whether she was aware of SJ's threats, whether she or SJ had referred to defendant as a rapist, or if she had ever known SJ to claim she had been raped. Through his own testimony, defendant suggested that the allegations of sexual abuse were based on AJ's viewing of a movie in which a similarly situated child fabricated evidence to frame her mother's boyfriend for sexual assault. Defendant's brother also testified that AJ had told him defendant would be in jail a few weeks before the incident. Thus, the jury was well aware of defendant's theory that AJ concocted her allegations and evidence in an effort to remove defendant from her life. Evidence of SJ's threat, particularly considering that there was no evidence of a plan or conspiracy between AJ and SJ, would have added very little support to defendant's theory.

The prosecutor also presented a very strong case against defendant. AJ provided a detailed account of the assault. The prosecutor provided evidence corroborating AJ's testimony that defendant attempted to cover up his act by washing the bed linens. AJ testified that defendant stated he was scared to go to jail during the drive to her grandfather's home. The prosecutor also presented evidence that defendant acted strangely after dropping AJ off with her grandfather, and that he made incriminating statements to police after his arrest. The nurse who examined AJ testified concerning AJ's physical injuries, which were consistent with AJ's version of events and with the occurrence of a sexual assault. Semen was found on vaginal swabs taken from AJ. One form of DNA analysis failed to positively identify defendant as the source of the semen, but all the available data were consistent with defendant's individual DNA profile. A second form of DNA analysis established that the source of the semen was either defendant or one of his male relatives. Further evidence of defendant's guilt came from his own testimony. Defendant attempted to explain how this DNA could have been found on AJ's vaginal swabs by testifying that he saw a male relative fleeing his home when he arrived to pick up AJ. Sebring testified that defendant never made such a claim in his interview, and the prosecutor presented a rebuttal witness who testified that the male relative identified by defendant was being held in a juvenile detention center at the time of the incident. In view of this record evidence, any potential error was harmless.

Defendant also alleges error arising from the following colloquy, which occurred when defendant testified on his own behalf:

*Q.* Were you ever aware of, well, let me rephrase that. Were things done around the house specifically to try to get at you, any of the kids to try specifically to get at you or make you look in a bad light? Anything that was—

*A.* When the place, when C.P.S. was there every other week at least, once a week claiming I've done something. And C.P.S. came out on each and every one.

*The Prosecutor*: Your Honor, I am going to object. We had a ruling on this, and I would ask that it be stricken.

*The Court*: I believe [the] objection is sustained, and the remark is stricken.

Defendant argues that the trial court "erred in extending [its] prior ruling to [d]efendant's testimony, and should have given [d]efendant an opportunity to explain his personal contacts with [CPS], at least with respect to claims by the complainant." As the only ruling disputed by defendant is the ruling excluding SJ's statement contained within the CPS report, we presume that this is the ruling defendant believes was utilized to sustain the prosecutor's objection. In this regard, defendant's premise is dubious, as there is nothing in the record that makes it clear what earlier ruling the trial court relied on in striking defendant's remark, and neither the question posed nor the answer provided suggested a reference to SJ's threat.

Defendant asserts that, but for the trial court's ruling, he could have demonstrated a pattern of false claims by AJ, and states that such testimony was essential to his "constitutional right to testify and right to present favorable testimony." Defendant cites no legal authority regarding these rights, and offers no analysis of how these rights were violated. To the extent defendant contends the trial court's ruling violated his constitutional rights, he has abandoned the issue. " 'It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.' " *People v Waclawski*, 286 Mich App 634, 679; 780 NW2d 321 (2009), quoting *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Defendant's failure to brief the merits of his issue constitutes abandonment of the issue on appeal. *King*, 297 Mich App at 474.

## C. SEBRING'S TESTIMONY

Defendant next argues that the trial court erred by allowing Sebring to testify regarding whether he found defendant credible during his post-arrest interview. We disagree. Because defendant did not object to this testimony at trial, the error is unpreserved. *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001). Unpreserved claims of evidentiary error are reviewed for plain error affecting substantial rights. *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003). To be entitled to relief, defendant must demonstrate that an error occurred, that the error was plain, meaning that it was clear or obvious, and that the error affected his substantial rights, meaning that the error was outcome-determinative. *Id.* "Moreover, reversal is

only warranted when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of guilt or innocence." *Id*.

Defendant's challenge arises out of the following colloquy between Sebring and the prosecutor:

*Q*. All right. Was there anything else about the interview that drew your attention or if you need to refresh your recollection from your report?

*A*. I just want to be sure I am not forgetting anything in regards to that.

*Q*. I believe it's page five.

*A*. I did ask [defendant] if he would, if he had touched [AJ] in any sexual manner and my quote on my report, quote, no, I would never hurt my kid or kids.

*Q*. And you can't just read it. Trooper, if you need to refresh.

*A*. You don't want me to read the quotes?

*Q*. No, you can refresh your recollection though if you've forgotten some things[.]

*A*. Okay. You know at some point I told him I didn't believe him, didn't seem true compared to my interview with [AJ] versus the interview with him.

*Q*. All right. So you had the opportunity then to give him the opportunity to give you an explanation about this, what was going on, correct?

*A*. Correct.

*Q*. Did he ever tell you anything about anybody else being at the house when he got there?

*A*. No, he did not.

*Q*. And any kind of other explanations why, you know, of other people or anything like that that would have been doing this?

*A*. No, not, not of anybody else.

*Q*. And maybe I misunderstood, is there something you want to share with regard to that?

*A*. I was going to share with [sic] the way I ended the interview.

*Q*. All right. How did you end the interview?

-10-

*A.* I felt that [defendant] was just flat out lying about the events of the day. And I said to him, and this I had no evidence to this, but I did say based on [AJ] telling me that [defendant] had ejaculated on her stomach, I asked him at the end of the interview what he really, what I really felt and I believe he was just not telling me the truth. I asked him how it was possible that she, why did [AJ] have your semen on her stomach and he said that it might have been from a towel that he, that he had used while having, after having sex with [AJ's mother].

Sebring shared defendant's explanation of how the semen would have ended up on a towel left in the bathroom. Sebring testified that he explained to defendant why he did not believe defendant's story. He testified, "I didn't believe it then, I don't believe it now, so I had a problem with that." Sebring testified that this concluded his interview with defendant.

Defendant is not entitled to relief. A defendant may not assign error to something his attorney deemed proper at trial. *People v Barclay*, 208 Mich App 670, 673; 528 NW2d 842 (1995); see also *People v Gonzalez*, 256 Mich App 212, 224; 663 NW2d 499 (2003). After the prosecutor elicited the challenged testimony, defendant cross-examined Sebring and asked him to confirm that he did not believe defendant during the interview. This appears to have been by design; in his closing argument, defense counsel alluded to the circumstances of the interrogation, and argued that Sebring did not give defendant a fair opportunity to present his version of events during the interview. Defense counsel found it proper to elicit such testimony, and accordingly, cannot now claim that it was error for Sebring to so testify. *Barclay*, 208 Mich App at 673; see also *Gonzalez*, 256 Mich App at 224.

We fully acknowledge that witnesses are not generally permitted to testify regarding the veracity of another witness's trial testimony. As our Supreme Court explained in *People v Musser*, 494 Mich 337, 348-349; 835 NW2d 319 (2013):

> It is "[t]he Anglo–Saxon tradition of criminal justice . . . [that] makes jurors the judges of the credibility of testimony offered by witnesses." *United States v Bailey*, 444 US 394, 414; 100 S Ct 624; 62 L Ed 2d 575 (1980). Because it is the province of the jury to determine whether "a particular witness spoke the truth or fabricated a cock-and-bull story," *id.* at 414-415, it is improper for a witness or an expert to comment or provide an opinion on the credibility of another person while testifying at trial. *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985). See also, *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995). Such comments have no probative value, *Buckey*, 424 Mich at 17, because "they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence." *Connecticut v Taft*, 306 Conn 749, 764; 51 A3d 988 (2012) (citation and quotation marks omitted). See also, *People v Row*, 135 Mich 505, 507; 98 NW 13 (1904) (explaining that opinion testimony regarding a complainant's veracity is not competent evidence). As a result, such statements are considered "superfluous" and are "inadmissible lay witness [] opinion on the believability of a [witness's] story" because the jury is "in just as good a position to evaluate the [witness's] testimony." *People v Smith*, 425 Mich 98, 109, 113; 387 NW2d 814 (1986).

In *Musser*, a videotaped interrogation was presented to the jury, during which the police officers conducting the interview made a number of comments regarding the veracity of the complainant, a child. *Id*. at 340-348. Our Supreme Court noted that it was clear that one testifying witness could not testify to the veracity of another witness's testimony, but that the Court had yet to definitively rule regarding whether the same type of commentary, made during an out-of-court interview, was also improper to admit at trial. *Id*. at 348-351. The Court noted that many jurisdictions struggled with the issue, and reached divergent conclusions. *Id*. at 351-353. Ultimately, the Court declined "to adopt a bright-line rule for the automatic exclusion of out-of-court statements made in the context of an interrogation that comment on another person's credibility because the issue can be adequately addressed by our existing rules of evidence." *Id*. at 353.

Thus, contrary to defendant's premise, there is no bright-line rule excluding Sebring's testimony as improper. Had Sebring testified regarding whether defendant was truthful while testifying at trial, such commentary would have been improper. *Id*. at 348-349. However, all of Sebring's comments regarding defendant's veracity were directed at defendant's statements to Sebring during his interview, not at defendant's trial testimony. Thus, the question was whether the statements were admissible under the rules of evidence. *Id*. Defendant makes no argument regarding whether the rules of evidence precluded Sebring's testimony, and accordingly has not demonstrated error.

Nor has defendant demonstrated prejudice. Defendant argues only that Sebring's comments could have persuaded the jury to find defendant's trial testimony incredible. The trial court instructed the jurors that it was their duty to judge the credibility of the witnesses, and to judge Sebring's testimony in the same way they would judge the testimony of any other witness. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Given that Sebring was commenting on defendant's veracity during his interview, and not defendant's trial testimony, and considering the trial court's instructions, we find no prejudice arising from Sebring's testimony.

## D. EVIDENCE OF DEFENDANT'S ALTERCATION WITH A NEIGHBOR

Defendant argues that the trial court erred by allowing the prosecutor to cross-examine him regarding an argument he had with a neighbor. We disagree. In the trial court, defendant did not raise the objections he raises on appeal. Accordingly, the issue is unpreserved and we review it for plain error affecting substantial rights. *Coy*, 258 Mich App at 12.

Defendant's claim of error arises from the following colloquy between the prosecutor and defendant during cross-examination:

> *Q*. In regards to, you mentioned something earlier about that you don't point guns at people?
>
> *A*. No.

*Q*. I believe you don't do those kinds of things. That's not what you do. And are you denying the fact that you've had altercations where you have had your gun accessible because you have had altercations with people?

*A*. No, I did not pull a gun then.

*Q*. That's not the question. My question is are you denying whether you have had an altercation with neighbors or outside people where you've had your gun there in case, in case of problems?

*A*. The only time, once when my neighbor's dog was about to, I was afraid it was about to bite me, [] it went after my youngest daughter.

*Q*. That's the only occasion you remember?

*A*. That's the only time I ever did.

*Q*. You don't recall an incident with your Hispanic neighbor in regards to him driving down the alley too fast back in 2000, I believe it was '09?

*A*. Yeah, they used that as a race way, but I did not pull a gun on anybody.

*Q*. If I show you a police report would that refresh your recollection about having your gun out or not?

*A*. I did not pull a gun on anybody.

*Q*. That's not what I am asking. I am asking whether you had your gun present because you were concerned about the situation?

*A*. I probably had it concealed on me. That's what a concealed license is for.

*Q*. Okay. I am going to show you, I've got a police report from—

Defendant's attorney objected on relevance grounds. The prosecutor explained that "we have spent an hour and a half talking about how he doesn't, he is not violent, he didn't do any of these things." The trial court allowed the prosecutor to present the report to defendant to refresh his recollection. Defendant's attorney objected to the report on hearsay grounds. The trial court overruled the objection because the report was not being admitted, but was only being used to refresh defendant's memory. The prosecutor then questioned defendant regarding the incident. Defendant admitted that he told officers he was carrying a gun at the time, but denied pulling the gun out at any time.

The prosecutor's questioning was proper. Generally, character evidence is not admissible "for the purpose of proving action in conformity therewith . . . ." MRE 404(a). However, a defendant in a criminal trial is permitted to present evidence of pertinent character traits. MRE 404(a)(1). But once he does so, the prosecutor may respond by inquiring into specific instances

of conduct. "Where . . . evidence of a pertinent character trait is admitted, MRE 405(a) allows cross-examination into relevant specific instances of conduct." *Lukity*, 460 Mich at 498. Here, likely in an effort to call into doubt AJ's testimony that defendant had used a gun during the assault, defendant testified extensively that he was a responsible gun owner, that he never pointed a gun at anyone, and that to do so would not have been in his character. This testimony opened the door for the prosecutor to question defendant regarding specific instances of conduct, such as the incident with his neighbor, which would refute defendant's testimony. *Id*. See also MRE 405(a).

Defendant argues that it was improper for the prosecutor to cross-examine defendant "about criminal activity that did not result in conviction . . . ." He first argues that this is improper under MRE 609. MRE 609 is inapplicable here. MRE 609 pertains to the use of evidence of criminal convictions to impeach a witness's credibility. The prosecutor did not introduce or seek to introduce evidence of a criminal conviction. Defendant next cites *People v Falkner*, 389 Mich 682; 209 NW2d 193 (1973). *Falkner* is also inapplicable. In *Falkner*, our Supreme Court held that "in the examination or cross-examination of any witness, no inquiry may be made regarding prior arrests or charges against such witness which did not result in conviction; neither may such witness be examined with reference to higher original charges which have not resulted in conviction, whether by plea or trial." *Id*. at 695. The prosecutor did not question defendant regarding any arrest or charges stemming from the incident. Thus, *Falkner* is inapplicable.

Finally, defendant argues that the prosecutor's questioning did not comport with MRE 404(b). MRE 404(b) pertains to the admissibility of evidence of "other crimes, wrongs, or acts." The rule requires a prosecutor to demonstrate a specific purpose for the evidence before it may be admitted, and requires that the defendant be given notice of the nature of the evidence and rationale for its admission. MRE 404(b)(1) and (2). However, MRE 404(b) was not implicated here. The facts of this case are comparable to *Lukity*. In *Lukity*, 460 Mich at 497, the prosecutor cross-examined the defendant regarding whether he smoked marijuana with his son. Our Supreme Court found that this questioning did not implicate MRE 404(b):

> Here, the prosecutor did not attempt to introduce evidence that defendant smoked marijuana with his son to prove that defendant had acted in conformity with his character for marijuana use. Rather, he merely cross-examined defendant regarding this issue, as permitted by MRE 405(a), in response to defendant's testimony, under MRE 404(a)(1), that he was a father who only engaged in appropriate activities with his children. This cross-examination under MRE 405(a) simply did not implicate MRE 404(b). Thus, the prosecutor was not obligated, under MRE 404(b), to demonstrate a purpose under which such evidence would be admissible or to provide notice. [*Lukity*, 460 Mich at 499-500.]

In this case, the prosecutor similarly cross-examined defendant, as was permitted by MRE 405(a), in response to defendant's testimony that he was a responsible, safety-minded gun owner. The prosecutor did not seek to introduce any independent evidence of the incident. Accordingly, MRE 404(b) was not implicated. *Lukity*, 460 Mich at 500.

Even if the trial court had erred by admitting this testimony, defendant cannot demonstrate prejudice. The prosecutor's questioning was clearly aimed at undercutting defendant's assertion that he was a responsible gun owner who would not have pointed a gun at anyone, including AJ. The jury apparently believed defendant in this regard, as it acquitted him of all gun-related charges. Thus, defendant cannot demonstrate prejudice arising from the prosecutor's questioning of defendant.

Affirmed.

/s/ Kathleen Jansen
/s/ Michael J. Talbot
/s/ Deborah A. Servitto