# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DEMETRIUS DESEAN MORGAN,

Defendant-Appellee.

UNPUBLISHED
November 29, 2018

No. 335855
Wayne Circuit Court
LC No. 15-008349-01-FC

Before: MURRAY, C.J., and METER and GLEICHER, JJ.

PER CURIAM.

Defendant appeals by delayed leave granted his convictions, following a jury trial, of first-degree premeditated murder, MCL 750.316(1)(a); possession of a firearm by a felon, MCL 750.224f; and possession of a firearm during the commission of a felony, MCL 750.227b. The trial court imposed a sentence of two years' imprisonment for the felony-firearm conviction, to be served before and consecutively to concurrent sentences of life imprisonment without parole for the murder conviction and two to five years' imprisonment for the felon-in-possession conviction. We affirm.

## I. BASIC FACTS

Defendant's convictions arose from a homicide that took place outside a Citgo gasoline station at the corner of Chalmers St. and Houston Whittier St. in Detroit during the early-morning hours of September 10, 2015. The victim was shot several times at close range. The prosecution's theory of the case was that defendant was affiliated with a gang that regarded that gas station as part of its territory and that the victim had "intruded" on the territory. The defense conceded that defendant was present at the gas station for some of the time that the victim was there, but maintained that defendant had left the premises at the time of the shooting and was misidentified as the shooter.

The homicide was captured by surveillance video equipment, but it was not possible to identify the shooter from the resulting imagery, although the footage did appear to show the shooter wearing some apparel similar to what defendant was wearing earlier that night. The sole eyewitness to the homicide was a nonspeaking deaf man, who during the investigation twice selected defendant's image from a photographic lineup, and who at trial, with the assistance of two sign-language interpreters, identified defendant as the shooter—albeit with some apparent equivocation. The prosecution also presented evidence that a gang known as "Chedda Ave"

-1-

trafficked in narcotics in, and asserted control over, the area of the homicide, and that defendant was known publicly as a member of a rap group with the same name.

Defendant's cousin told the police that defendant had come to her home that night and remained there through the time of the shooting.[1] Defendant in turn testified that he went to his cousin's home from the Citgo station, but that he then changed clothes and visited a casino for about 15 minutes. A police officer testified that defendant had telephone conversations with his mother while he was incarcerated as a suspect in this case, and that in those calls they talked about an alibi and the mother advised defendant not to say anything about the casino.

In this appeal, defendant challenges his convictions, raising issues through both appointed appellate counsel, and in a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4 (Standard 4 brief).

## II. APPELLATE COUNSEL'S ISSUES

Appellate counsel first argues that defendant's trial attorney was ineffective for not having moved the trial court to suppress the eyewitness's identification of defendant on the grounds that that witness's identification from the investigation onward was tainted by improper suggestiveness or otherwise as the result of reliance by the police and prosecution of unqualified sign-language interpreters. Appellate counsel alternatively argues that the prosecution presented insufficient evidence to establish defendant's identity as the shooter and that defense counsel was ineffective for not having moved the trial court to either quash the bindover or direct a verdict of acquittal at trial. Appellate counsel moved for a new trial on these bases, but the trial court denied the motion, and did so without supplementing the record with an evidentiary hearing.

## A. IDENTIFICATION PROCEDURES

A trial court's decision on a motion for a new trial is reviewed for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003); *People v Lemmon*, 456 Mich 625, 648 n 27; 576 NW2d 129 (1998). We also review for an abuse of discretion a court's decision regarding whether to hold an evidentiary hearing. See, e.g., *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008).

"A claim of ineffective assistance of counsel presents a mixed question of law and fact. This Court reviews a trial court's findings of fact, if any, for clear error, and reviews de novo the ultimate constitutional issue arising from an ineffective assistance of counsel claim." *People v Brown*, 294 Mich App 377, 387; 811 NW2d 531 (2011) (citations omitted). However, where there has been no evidentiary hearing on the issue, this Court's review of claims of ineffective assistance of counsel is limited to mistakes apparent on the existing record. See *id.*[2] "In

---

[1] She later stated that she did not "know if he left or not because [she] went to sleep."

[2] We note that this Court denied defendant's motion for a remand. *People v Morgan*, unpublished order of the Court of Appeals, issued April 17, 2018 (Docket No. 335855). We decline to revisit this decision.

reviewing a defendant's claim of ineffective assistance of counsel, the reviewing court is to determine (1) whether counsel's performance was objectively unreasonable and (2) whether the defendant was prejudiced by counsel's defective performance." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Regarding the latter, the defendant, to obtain relief, must show that the result of the proceeding was fundamentally unfair or unreliable and that but for counsel's poor performance, the result would have been different. *People v Messenger*, 221 Mich App 171, 181; 561 NW2d 463 (1997).

A trial court's decision to admit identification evidence should not be reversed unless clearly erroneous, and clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made. *People v Kurylczyk,* 443 Mich 289, 303 (GRIFFIN, J., joined by MALLETT, J.), 318 (BOYLE, J., joined by RILEY, J., joining GRIFFIN, J., in pertinent part); 505 NW2d 528 (1993), implied overruling on other grounds recognized by *People v Perry*, 317 Mich App 589, 598; 895 NW2d 216 (2016); *People v Williams*, 244 Mich App 533, 537; 624 NW2d 575 (2001). The fairness of an identification procedure is evaluated in light of the total circumstances to determine whether the procedure was so impermissibly suggestive as to render the identification irreparably unreliable. *Kurylczyk,* 443 Mich at 311-312, 318; *People v McCray*, 245 Mich App 631, 639; 630 NW2d 633 (2001); *People v Davis*, 146 Mich App 537, 548; 381 NW2d 759 (1985). If a witness is exposed to an impermissibly suggestive pretrial lineup, that witness's in-court identification of the defendant should not be allowed unless the prosecution shows by clear and convincing evidence that the in-court identification has a sufficiently independent basis to purge the taint of the improper identification. *People v Gray,* 457 Mich 107, 115; 577 NW2d 92 (1998); *People v Kachar*, 400 Mich 78, 91-93; 252 NW2d 807 (1977). "The need to establish an independent basis for an in-court identification arises [only] where the pretrial identification is tainted by improper procedure or is unduly suggestive." *People v Barclay*, 208 Mich App 670, 675; 528 NW2d 842 (1995).

Appellate counsel asserts that the eyewitness's deafness "made it impossible for him to communicate with hearing, speaking persons." Appellate counsel, however, exaggerates the eyewitness's communication capabilities. Even persons with normal hearing often supplement speaking and listening with other forms of communication, such as gestures and writing. Appellate counsel does not dispute the credentials or performance of the interpreters who assisted the eyewitness at trial, or of the one who assisted with part of the investigation and appeared as an expert at trial. Although the eyewitness's deafness presented special challenges in communicating with the police, and at trial, those challenges were not insurmountable.

Appellate counsel additionally states that the eyewitness, "apparently, from the evidence presented, could not read or write effectively," but offers no record citations to support that assertion. In fact, the record shows that the eyewitness could sign his name, and otherwise leaves unanswered the question of his general state of literacy. Regardless, in making issue of the eyewitness's reading ability, appellate counsel mentions only that the eyewitness signed a statement prepared for him early in the investigation as an instance where written words came into play in connection with that witness. But counsel does not assert, let alone offer a record citation to show, that this printed statement was relied upon by anyone involved in the case thereafter. Further, the sign-language expert offered compelling testimony at trial to the effect that the eyewitness's entire initial interview with the police, relying on the limited interpreting abilities of one officer, resulted in no useful or reliable information, including the statement the

-3-

eyewitness signed. Although appellate counsel suggests that the eyewitness's offering of "statements to various law enforcement parties without the benefit of a proper interpreter" resulted in a tainted identification of defendant, counsel presents no reason to suppose that anything from the interview involving the officer with poor signing capabilities was suggestive of defendant as the shooter.

Appellate counsel also offers no argument impugning either of the photographic lineups from which the eyewitness selected defendant's image, and the descriptions of those proceedings at trial included no basis for supposing that any such impropriety tainted the identifications. A police sergeant described visiting the eyewitness at the latter's workplace, where the two were assisted in communications only by the eyewitness's coworker or supervisor, and individually displaying for the eyewitness six photographs, from which the eyewitness showed obvious excitement over the image of defendant and none other. The police sergeant described gestures from the eyewitness that required no expert to interpret, explaining that "he emphatically pointed at the picture and tapped it several times" and also "gestured . . . with his hands in the shape of a handgun and pointed at the picture . . . and made several motion[s] with his hand as if he were shooting someone on the ground." The police sergeant additionally testified that the police had no suspect in view when trying to communicate with the eyewitness earlier in the investigation such that they might have suggested, then, a possible suspect to him. The sign-language expert in turn described acting as interpreter when the eyewitness was again presented with the photographic lineup; he described how the eyewitness, upon reaching defendant's image, "was pointing and pointing that's the shooter . . . as he pounded on the page." The expert stated that he was physically reacting to defendant's image such that "you almost didn't even need to know sign language" to understand that the eyewitness was emphatically identifying defendant. Further, the sign-language expert made clear that for his part in interpreting for the eyewitness, "[h]is reading abilities . . . wouldn't play a part at all," effectively neutralizing appellate counsel's speculations concerning the eyewitness's ability to read.

Appellate counsel argues that the eyewitness's performance at the preliminary examination did not include a reliable identification of defendant as the shooter, and points out some apparent inconsistencies in what the eyewitness had to say, but appellate counsel does not argue that the proceeding itself infected the eyewitness with some improper suggestion that defendant was the guilty person.

Further, although appellate counsel complains about the lack of proper "translations" of the eyewitness's sign-language communications, appellate counsel stops short of impugning the credentials, or of offering examples of inaccuracy, of the persons who performed that function at trial or of the person who was recognized as an expert at trial and who also assisted in the investigation.

In sum, although the eyewitness's deafness presented special communication problems, appellate counsel has failed to show that the police or prosecution did not recognize those challenges and meet them head on.

Appellate counsel has failed to show that the eyewitness's identification of defendant as the shooter was tainted by improper suggestiveness. Because the eyewitness appeared at trial with no improper taint regarding his ability to identify defendant, defense counsel would have

had nothing to gain from seeking to suppress that identification. A trial attorney is "not required to argue a frivolous or meritless motion." *People v Gist*, 188 Mich App 610, 613; 470 NW2d 475 (1991).

## B. SUFFICIENCY OF THE EVIDENCE

Whether the prosecution presented sufficient evidence to support a verdict of guilty is a question of law, calling for review de novo. *People v Herndon*, 246 Mich App 371, 415; 633 NW2d 376 (2001). When reviewing the sufficiency of evidence in a criminal case, a reviewing court must view the evidence of record in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that each element of the crime was proved beyond a reasonable doubt. *Id.*

Appellate counsel argues that the sole eyewitness's equivocation in identifying defendant at trial as the shooter left the jury without a sufficient basis for concluding beyond a reasonable doubt that defendant was in fact the guilty person. We disagree.

The identity of the offender is an element in every offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). The accounts of a single witness can suffice to persuade a jury of a defendant's guilt beyond a reasonable doubt. See, generally, *People v Jelks*, 33 Mich App 425; 190 NW2d 291 (1971).

In this case, the eyewitness unequivocally testified that he had selected defendant's image at the photographic lineups presented to him as part of the investigation, but when asked to identify defendant at trial, the witness could not seem to avoid some equivocation. When the prosecutor later asked the eyewitness if he realized that the picture he selected from the lineup was of defendant, the witness replied, "He didn't have a big face he had a small face he didn't have a big head he had a small head . . . almost like a rat face," adding, "almost like he had think [sic] eyebrows he had these big eyebrows you know I think that's the picture." A jury could have reasonably viewed the eyewitness's apparent equivocation over a matter not actually in doubt (i.e., that the picture the eyewitness chose was a picture of defendant) as signaling that the witness's nervousness, or other excitement, in the trial setting caused him to pepper his identifications of defendant with impressions relating to how a photograph of a person might not perfectly match that person's later personal appearance.

Further, the sign-language expert offered a benign explanation for what might otherwise seem a striking inconsistency in the eyewitness's statements. Confronted at trial with indications that while the investigation was in progress he had told the prosecution that he had seen the shooter "many times" before, the eyewitness replied, "I said I never saw him before." Asked if his expertise in American sign language suggested an explanation for the apparently inconsistent answers, the expert offered the following response:

> As an interpreter the word ["]defendant["] make us pause. Should make us as interpreters pause because [deaf] people . . . don't have the same exposure [to words] like ["]defendant["] that we have.

. . . He does not know what the word defendant is. So how I would sign the word defendant to him is built up in the conversation before court starts. Some interpreters have been legally trained do it [sic] and some don't.

And if he didn't know what the word defendant means as you can see on the video, he will answer a question without knowing exactly what it is.

So if he responded I've never seen him before did he know he was talking about the defendant or the victim . . . [?]

The eyewitness's deafness, combined with his apparent nervous or otherwise excited answers to questions, did indeed present special challenges to the jurors in weighing that witness's testimony. But even when a witness's identification of the defendant is less than 100% solid, the question remains one for the jury. See *People v Abernathy*, 39 Mich App 5, 7; 197 NW2d 106 (1972), and *People v Smith*, 15 Mich App 505, 507; 166 NW2d 610 (1969).

In this case, in addition to the eyewitness's seemingly equivocal identification at trial, the jury had for its consideration the evidence of that witness's emphatic selection of defendant's image each time a six-image photographic array was shown to him. Also in evidence was defendant's own account of being at the subject Citgo station near the time of the shooting. Also, even if not conclusive by itself, good circumstantial evidence linking defendant to the crime was that the shooter, as described by the eyewitness, was wearing black pants and red shoes similar to what defendant was wearing while admittedly at the Citgo.

Further, defendant described going from the Citgo to his cousin's home, changing clothes, then spending only a token amount of time at a casino. The prosecution's theory that defendant took those actions to create evidence suggesting an alibi was bolstered by the evidence of a second attempt to manufacture an alibi not consistent with defendant's own. In particular, defendant's cousin included specific times of day with her statements to the police about defendant's having spent time at her house on the night in question, but the times did not comport with defendant's account of briefly visiting a casino, or with the surveillance footage showing defendant at both the Citgo and the casino, and the cousin admitted offering her statement to the police in the first instance in hopes of providing defendant with an alibi. The evidence further indicated that defendant's mother, in a telephone conversation with defendant after he was arrested, admonished him to not to speak of his visit to the casino, as if recommending the cousin's manufactured alibi over defendant's own.

For these reasons, we reject appellate counsel's challenge to the sufficiency of the evidence to support the verdict at trial.

Our rejection of the sufficiency claim predicated on the prosecution's asserted failure to establish defendant's identity as the shooter obviates our need to consider appellate counsel's related arguments that defendant's trial attorney was ineffective for not having moved the trial court to quash the bindover or grant a directed verdict of acquittal. We note that there is no preservation requirement for appellate review of a challenge to the sufficiency of the evidence to support a verdict in a criminal case. See *People v Patterson*, 428 Mich 502, 514; 410 NW2d 733 (1987). Accordingly, the lack of any such motion below left defendant at no disadvantage in

-6-

asking for this Court's review de novo of that legal question on appeal. Moreover, an appellate court's decision de novo on a sufficiency challenge renders moot whether such a challenge would have succeeded if urged as ground for a directed verdict at trial. Finally, we point out that even when a magistrate has erroneously concluded that sufficient evidence was presented at the preliminary examination to support a bindover, such error is rendered harmless by conviction at trial on the basis of sufficient evidence. *People v Meadows*, 175 Mich App 355, 359; 437 NW2d 405 (1989).

## III. DEFENDANT'S STANDARD 4 BRIEF

Defendant, in his Standard 4 brief, argues that he was denied a fair trial by the introduction of evidence of his participation in a rap group sharing the name of the gang that asserted control over the area where the homicide took place, by the empaneling of an allegedly biased juror, and by the victim's cousin's testimony that defendant told him that the victim's family had formed the opinion that defendant had committed the homicide. Defendant additionally asserts that defense counsel was ineffective for not having raised objections in connection with the challenged juror or the testimony concerning the victim's family's suspicions.

## A. RAP GROUP

Defendant argues that the trial court erred by overruling objections to the evidence linking him to a rap group with the same name as the gang that asserted control over the area in question, on the grounds that it was both irrelevant, see MRE 401, and unfairly prejudicial, see MRE 403. Defendant additionally argues for the first time on appeal that the prosecution's use of that evidence violated his constitutional rights of association and expression.[3]

This Court reviews a trial court's evidentiary decisions for an abuse of discretion. *People v Martzke*, 251 Mich App 282, 286; 651 NW2d 490 (2002). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Waterstone*, 296 Mich App 121, 131-132; 818 NW2d 432 (2012). This Court reviews constitutional questions de novo. *People v Conat*, 238 Mich App 134, 144; 605 NW2d 49 (1999). However, because defendant's constitutional issues were not raised below, our review is for plain error affecting substantial rights. See *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008), citing *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

A police detective assigned to a unit combating Detroit's street gangs testified that the area of Chalmers and Houston Whittier, including the Citgo station where the subject homicide took place, was menaced by a gang known as "Chedda Ave," which trafficked in narcotics in, and asserted control over, the area.

The police officer in charge of the investigation identified records from an internet social networking site under the name "Chedda Ave Meech," explaining that this was defendant's

---

[3] US Const, Am I; Const 1963, art 1, § 3 (assembly) and § 5 (expression).

account name. The officer additionally identified a post from that account that was made on September 19, 2015, and that stated, "I heard the police look for me because I got the hood hot[.]" The officer also identified images of defendant at the apartments next to the Citgo station. The officer further testified that her investigation included scouting a popular video-sharing site for features involving defendant, and she identified an exhibit as "a video for Chedda Ave called everybody wanna be a boss[.]" It depicted defendant and other "Chedda Ave people . . . actually on top of the [Citgo] gas station" in the area in question. The officer explained that she resorted to such internet sleuthing because "with social media people tend to kind of be open about information and they also tend to post pictures and it is just another valuable tool to help with the investigation."

Defendant admitted that he was present at the Citgo station on the night in question and that he sometimes answered to the nickname "Meech." He also admitted his participation in a group of some sort called "the Chedda Ave"[4] and admitted being the singer of a rap song whose lyrics included a reference to "another body up at the Citgo[.]"

Defendant argues that the evidence concerning the activities of the Chedda Ave gang was not relevant because there was no evidence that the subject homicide was gang-related. We disagree, given the prosecution's theory that defendant was affiliated in some manner with a gang that regarded the Citgo station as part of its territory upon which the victim had intruded, and that intrusion on gang turf, in the absence of any evidence of personal animosity, was the motive for the point-blank shooting of a young man who was only standing and smoking while apparently waiting for a ride and who showed no apprehension when his eventual killer approached him.

Defendant points out that rap music by its nature "reflects and glorifies violent street life and inner-city culture," and he argues that his participation in rap performances no more implicate him in the subject homicide than do "the movies of Sylvester Stallone or Bruce Lee" implicate those performers in violent crime. This comparison is inapt, however. The evidence showing defendant's involvement with a group bearing the name of the gang identified as the one asserting control over the area in question, including his singing a lyric about "another body up at the Citgo," was offered not to suggest generally that defendant was a gang member and thus an indiscriminately violent person, but rather to show specifically that defendant at least identified with that gang. This, in turn, gave rise to the inference that defendant was at least in harmony with that gang's territorial sensitivities or proclivities. Further, as the prosecutor suggested at trial, the evidence also explained why the arresting officer, and also the head of the investigation, respectively, came to regard defendant as a person of interest.

For these reasons, the trial court's decision to allow the challenged evidence did not fall outside of the range of reasonable and principled outcomes. See *Waterstone*, 295 Mich App at 131-132.

---

[4] From context, this appears to be a rap-music group.

In addition, we find no plain error in connection with defendant's unpreserved constitutional arguments about how use of the evidence of his affiliation with "the Chedda Ave" allegedly violated his expressive and associational rights. Defendant argues that making prosecutorial capital out of his membership in a rap group violated his associational rights and that making such capital out of a lyric that he sang violated his expression rights. Defendant relies on *Dawson v Delaware*, 503 US 159, 168; 112 S Ct 1093; 117 L Ed 2d 309 (1992), in which the United States Supreme Court held that a defendant's First Amendment rights were violated by the introduction of evidence at a sentencing hearing that the defendant was a member of a prison gang, when that evidence proved nothing more than the defendant's "abstract beliefs," which had "no bearing on the issue being tried." But the Court first advised that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165.

Defendant likens his case to *Dawson* on the ground that the evidence of his involvement in a rap group engaging in First Amendment activity "proved nothing more than Defendant's innocent association with others." Defendant further argues that "the lyric 'another body up at the Citgo' was an irrelevant statement of 'machismo' typical of rap songs." However, evidence of membership in a rap group which adopted the name of the gang asserting control over the area at issue and whose expressive activities included publicly celebrating dominion over the Citgo station at issue showed at least a strong personal and regional affinity with that gang, and thus had direct bearing on the prosecution's theory that the subject murder was committed as an assertion of territorial dominance. Defendant had a constitutional right to indulge in an artistic celebration of violent inner-city culture, or otherwise to display a personal affinity with a gang, but not to keep a jury from learning of such things when they bore on the prosecution's theory of the case. No plain error is apparent.

## B. ALLEGEDLY BIASED JUROR

Defendant argues that he was denied an impartial jury when a prospective juror stated that he had been victim of an armed robbery, then was seated and sworn without further inquiry into the matter. Because there was no objection below, our review is for plain error affecting substantial rights. *Miller*, 482 Mich at 559; *Carines*, 460 Mich at 763-764.

"[A] criminal defendant has a constitutional right to be tried by an impartial jury . . . ." *Miller*, 482 Mich at 547. However, "jurors are presumed to be . . . impartial, until the contrary is shown," and the defendant bears the burden of establishing that a juror "was not impartial or at least that the juror's impartiality is in reasonable doubt." *Id*. at 550 (quotation marks and citations omitted).

Defendant bases this appellate claim on the following exchange that took place in response to the trial court's inquiry regarding whether any of the prospective jurors had been victims of a crime:

> *JUROR NO. 12:* Robbed at knife point as a paper boy long a long time ago.

*THE COURT:* You got robbed at knife point?

*JUROR NO. 12:* Yes.

*THE COURT:* So did I when I was a paper boy.

*JUROR NO. 12:* Free [P]ress.

*THE COURT:* That's a coincidence.

Later, when the court asked the prospective jurors about having friends or relatives who were law-enforcement officers, Juror 12 advised that he was friends with the Wayne County Prosecutor and also with a district judge. Asked if those relationships would influence him, Juror No. 12 answered, "I can be fair."

Defendant protests that "[n]o one ever returned to ask Juror 12 if he could set aside the fact that he had been robbed at knife point," and objects that Juror No. 12 "was not excused from the panel and went on to serve on the jury." Defendant asserts that what Juror No. 12 revealed about being robbed as a newspaper carrier placed his impartiality in reasonable doubt, resulting in plain error because he "never said he could set aside the fact that he had been robbed at knife point." We are not persuaded by defendant's argument.

The instant case concerned a person murdered by being shot at close range. In contrast, Juror No. 12 described being robbed, i.e., threatened. Juror No. 12 gave no hint that this crime that took place "a long time ago" left him severely traumatized such that he could not be impartial in deciding a criminal case. The court, in effect, signaled that it detected no lingering problems for that juror by asking no follow-up questions and conversationally volunteering that the court had suffered the same crime as a youth. The juror confirmed the court's impression by offering no further details about the incident other than the benign one that the newspaper for which he was delivering papers was *The Detroit Free Press.* Defendant cites no authority that stands for the proposition that a distant history as the victim of a robbery *per se* rebuts the presumption of juror impartiality. We find no plain error.

Further, defense counsel actively participated in jury selection, including by exercising multiple peremptory challenges. Contrary to defendant's argument, there is simply no basis from which to conclude that counsel was ineffective by failing to further question the juror, especially when the juror explicitly stated (albeit in the context of discussing his friends in the legal system) that he could be a fair juror.

## C. VICTIM'S COUSIN'S STATEMENT

Defendant argues that he was denied a fair trial when the victim's cousin testified that defendant had told him that the victim's family thought defendant was the shooter, asserting that this was inadmissible hearsay, the introduction of which violated his right to confront adverse witnesses. Defendant admits that the challenged testimony drew no objection below, leaving appellate objections unpreserved. Our review is thus for plain error affecting substantial rights. See *Miller*, 482 Mich at 559; *Carines*, 460 Mich at 763-764.

Defendant takes issue with the victim's cousin's testimony that, a few days after the cousin saw defendant at a candlelight vigil for the victim at the home of the victim's grandmother, defendant telephoned him and said "[h]e heard my family was saying that he did it and stuff like that." The witness then answered "I guess" when asked if defendant had simply wanted to let him "know that."

Hearsay, meaning testimony about a person's unsworn, out-of-court assertions offered to prove the truth of the matter asserted, MRE 801(c), is generally inadmissible, MRE 802, subject to several exemptions and exceptions as provided by the rules of evidence. Defendant characterizes the challenged testimony as "not Defendant's statement," but rather as "the [victim's] family's statement that Defendant was the shooter." Even accepting defendant's debatable argument that the cousin's testimony was offered to prove that defendant "did it" (as opposed to being offered to prove what defendant knew about rumors surrounding the murder), any error did not rise to a level requiring reversal under the plain-error standard. This general information about "my family . . . saying that he did it," without any specifics to back it up and in light of the inculpatory evidence presented at trial, did not rise to the level of affecting the outcome of the trial. *Carines*, 750 Mich at 763.[5]

In connection with this issue, defendant argues that his trial attorney was ineffective for failing to object to the testimony, but defendant has not demonstrated that an objection would have affected the outcome of the trial. *Messenger*, 221 Mich App at 181.

Affirmed.


/s/ Christopher M. Murray
/s/ Patrick M. Meter
/s/ Elizabeth L. Gleicher

---

[5] We also note that the alleged and vague "statement" by the "family" was clearly not "testimonial" in that it was not the result of an attempt to "prove past events potentially relevant to later criminal prosecution." *Davis v Washington*, 547 US 813, 814; 126 S Ct 2266; 165 L Ed 2d 224 (2006).