*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DAMETRIUS BENJAMIN POSEY,

        Defendant-Appellant.

FOR PUBLICATION
October 22, 2020
9:15 a.m.

Nos. 345491; 351834
Wayne Circuit Court
LC No. 18-000074-01-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SANCHEZ QUINN,

        Defendant-Appellant.

No. 346039
Wayne Circuit Court
LC No. 18-000074-02-FC

Before: BOONSTRA, P.J., and MARKEY and HOOD, JJ.

MARKEY, J.

In these consolidated appeals, defendants Dametrius Posey and Sanchez Quinn appeal by right their convictions by separate juries at a joint trial. Posey was convicted of two counts of assault with intent to commit murder (AWIM), MCL 750.83, two counts of assault with intent to do great bodily harm less then murder (AWIGBH), MCL 750.84, carrying a concealed weapon (CCW), MCL 750.227, arming oneself with a weapon with unlawful intent, MCL 750.226, felon in possession of a firearm, MCL 750.224f, and six counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Posey as a third-offense habitual offender, MCL 769.11, to 22 to 40 years' imprisonment for the AWIM convictions, 9 to 20 years' imprisonment for the AWIGBH convictions, and 4 to 10 years' imprisonment for the CCW, arming-with-unlawful-intent, and felon-in-possession convictions, which are all to be served concurrently but consecutively to concurrent five-year terms of

-1-

imprisonment for the six felony-firearm convictions. After this Court granted Posey's motion to remand in regard to sentencing issues,[1] the trial court vacated the AWIGBH convictions and the two associated felony-firearm convictions, and it resentenced Posey to the same terms of imprisonment previously imposed for the remaining convictions. Quinn was convicted of two counts of AWIGBH, single counts of CCW, arming oneself with a weapon with unlawful intent, and felon in possession of a firearm, and four counts of felony-firearm. The trial court sentenced Quinn as a third-offense habitual offender to 9 to 20 years' imprisonment for the AWIGBH convictions and 4 to 10 years' imprisonment for the CCW, arming-with-unlawful-intent, and felon-in-possession convictions, which are all to be served concurrently with each other but consecutively to concurrent two-year terms of imprisonment for the felony-firearm convictions. Posey appealed his convictions and the original judgment of sentence in Docket No. 345941, and he appeals the amended judgment of sentence entered on resentencing in Docket No. 351834. Quinn appeals his convictions and sentences in Docket No. 346039. We affirm the convictions and sentences with respect to both defendants.

## I. FACTUAL SUMMARY

This case arises from a shooting outside the Super X Market, which is located at the corner of Charles St. and Sparling St. in Detroit. On Sunday, October 8, 2017, Terrence Byrd and his cousin Dwayne Scott were talking together outside the Super X Market near Byrd's Chevy Trailblazer. Two men, one described as dark-skinned and the other as being lighter-skinned, approached and entered the store. After a short period, the two men exited the store and flanked Byrd and Scott. The dark-skinned man produced a handgun and pointed it at Scott, while the other man pointed a gun at Byrd. Byrd, who had a permit to carry a concealed weapon, pulled out his firearm in response and gunfire rang out. Byrd discharged all 17 rounds in his gun in shooting at Quinn and Posey. He believed that he struck both assailants. Byrd could not say whether he or Posey shot first. Byrd testified that Quinn did not shoot first, nor did Byrd even see Quinn fire his gun. A spent casing, however, was found stuck in a gun that was dropped at the scene and linked to Quinn. Although Byrd was not injured during the episode, Scott was shot in his hip and left arm.

Although Byrd failed to identify Posey or Quinn in photo lineups shortly after the incident, and, in fact, selected other individuals in the arrays, he identified both of them at trial as the culprits, with Posey being the dark-skinned person and Quinn being the lighter-skinned person. In a pretrial photo lineup, Scott identified Posey as one of the shooters, but he was unable to identify the other shooter. Scott could not identify either defendant at the preliminary examination or trial. A surveillance video and photos of the events as they transpired outside the market were admitted into evidence. They showed clear pictures of the dark-skinned man, but the lighter-skinned man was wearing a hoodie and was more difficult to see.

---

[1] *People v Posey*, unpublished order of the Court of Appeals, entered July 5, 2019 (Docket No. 345491).

Posey and Quinn were both treated for gunshot wounds at area hospitals after the shooting. Quinn made statements at the hospital to the police in which, after first lying, he admitted being present during the shooting at the Super X Market. A video of that interview was admitted into evidence.[2] When police spoke to Posey at the hospital, he initially provided officers with a false name. Following defendants' convictions, these appeals ensued.

## II. DOCKET NOS. 345491 & 351834 – DEFENDANT POSEY

### A. DUE PROCESS AND IN-COURT IDENTIFICATION

Posey argues that he was denied his right to due process when Byrd was allowed to identify him at trial. We disagree. Because Posey did not object to Byrd's identification testimony at trial, this issue is unpreserved. We review unpreserved constitutional issues for plain error affecting substantial rights. *People v McNally*, 470 Mich 1, 5; 679 NW2d 301 (2004). Thus, to succeed, Posey must show that there was an error, that the error was clear or obvious, and that the error affected his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error affects substantial rights when it impacts the outcome of the lower court proceedings. *Id.* Additionally, reversal is only warranted when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when the error seriously affected the integrity, fairness, or public reputation of the judicial proceedings independent of the defendant's innocence. *Id.* at 763-764.

A defendant's right to due process is implicated if an in-court identification was preceded by a suggestive out-of-court identification. *Neil v Biggers*, 409 US 188, 196-198; 93 S Ct 375; 34 L Ed 2d 401 (1972). "In order to sustain a due process challenge, a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993). A suggestive identification procedure can arise when a witness is called by the police and is told that the police have arrested the right person, when a witness is shown only one person, or when a witness is shown a group of individuals wherein one person, the defendant, is uniquely singled out in some way, leading the witness to presume that he or she is the perpetrator. *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). "If the trial court finds that the pretrial procedure was impermissibly suggestive, testimony concerning that identification is inadmissible at trial." *Kurylczyk*, 443 Mich at 303.[3] But an in-court identification may be allowed and admitted despite an impermissibly-suggestive procedure if an independent basis for the in-court identification can be established that is untainted by the improper pretrial identification procedure. *Id.* "[R]eliability is the linchpin in determining the admissibility" of possibly tainted identification testimony. *Manson v Brathwaite*, 432 US 98, 114; 97 S Ct 2243; 53 L Ed 2d 140 (1977).

---

[2] Quinn's interview was presented only to his jury.

[3] "Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *People v Sammons*, __ Mich __, __; __ NW2d __ (2020); slip op at 6-7.

To determine if a witness has an independent basis for an in-court identification, the Michigan Supreme Court has identified eights factors a court should evaluate:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification. . . .

4. Accuracy or discrepancies in the pre-lineup or show-up description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. [T]he nature of the alleged offense and the physical and psychological state of the victim. . . .

8. Any idiosyncratic or special features of defendant. [*People v Kachar*, 400 Mich 78, 95-96; 252 NW2d 807 (1977).]

While Scott identified Posey in a pretrial photo lineup, Scott could not identify Posey at trial. Scott's pretrial identification of Posey is not at issue. Byrd did not identify Posey in a photo lineup before trial; he selected another individual. He did, however, identify Posey at trial. Byrd indicated that he realized he had identified the wrong person in the photo array after he saw Posey in a subsequent news broadcast. On appeal, Posey acknowledges that Byrd made no pretrial identification of Posey, let alone an improperly-suggestive identification. Nonetheless, Posey maintains that we should apply the factors governing the independent-basis test to assess the admissibility of Byrd's in-court identification of Posey.

"The need to establish an independent basis for an in-court identification *only arises* where the pretrial identification is tainted by improper procedure or unduly suggestive comments." *People v Laidlaw*, 169 Mich App 84, 92; 425 NW2d 738 (1988) (emphasis added). In *People v Barclay*, 208 Mich App 670, 675-676; 528 NW2d 842 (1995), this Court observed:

The need to establish an independent basis for an in-court identification arises where the pretrial identification is tainted by improper procedure or is unduly suggestive. At no point has defendant argued that the lineup procedure was improper or unduly suggestive. Rather, defendant's argument is premised on the fact that [the witness] did not identify defendant at a pretrial corporeal lineup, but identified him in court (at the preliminary examination) as the man who poured the gasoline in the store. The fact that [the witness] did not identify defendant at the lineup did not render his subsequent in-court identification inadmissible. Rather, this was a credibility issue that was properly before the jury to determine. The trial

court did not commit clear error in allowing the in-court identification testimony. [Citations omitted.]

Moreover, in *Perry v New Hampshire*, 565 US 228, 231-233; 132 S Ct 716; 181 L Ed 2d 694 (2012), the United States Supreme Court stated and held:

> In our system of justice, fair trial for persons charged with criminal offenses is secured by the Sixth Amendment, which guarantees to defendants the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution. Those safeguards apart, admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine. This Court has recognized, in addition, a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime.

> An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is a very substantial likelihood of irreparable misidentification, the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt. [Quotation marks and citation omitted.]

Here, there was no improper law enforcement activity and no pretrial identification by Byrd. Although Posey relies on *United States v Hill*, 967 F2d 226 (CA 6, 1992), which reached a conclusion compatible with Posey's argument, *Hill* is inconsistent with Michigan precedent, see *Barclay* quoted above, and was issued before the United States Supreme Court decided *Perry*. Posey's counsel aggressively challenged Byrd's testimony by highlighting how Byrd, while not under stress and with the incident still fresh in his mind, identified someone other than Posey in

the photo array and only changed his mind after viewing the news broadcast of the incident.[4] Byrd also acknowledged on cross-examination that when he made the identification at the police photo lineup, he did not know what the assailants looked like. It was for the jury to assess the reliability and credibility of Byrd's in-court identification of Posey as one of the shooters. We also note that Posey was treated for gunshot wounds at a hospital shortly after the shooting occurred, that he lied to police about his identity, and that Byrd believed that he hit both Posey and Quinn with gunfire. This evidence leads to an almost inescapable conclusion that Posey was present at the scene of the shooting.

Posey also argues that he was denied the effective assistance of counsel when trial counsel failed to object to Byrd's in-court identification testimony and when counsel failed to retain an expert witness on eyewitness identification. Whether counsel was ineffective presents a mixed question of fact, which is reviewed for clear error, and constitutional law, which we review de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Our Supreme Court in *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), articulated the principles governing a claim of ineffective assistance of counsel, stating as follows:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy [a] two-part test . . . . First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the counsel guaranteed by the Sixth Amendment. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. Second, the defendant must show that the deficient performance prejudiced the defense. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. [Citations and quotation marks omitted.]

An attorney's performance is deficient if the representation falls below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

"Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis,* 250 Mich App 357, 368; 649 NW2d 94 (2002); see also *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009) (principles also apply in regard to expert witnesses). We cannot, however, insulate the review of counsel's performance by simply calling it trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Initially, this Court must determine whether strategic choices were made after less than complete investigation, with any choice being reasonable only to the extent that

---

[4] We note that Posey does not make any argument that Byrd's viewing of the broadcast impermissibly tainted his in-court identification such that the identification was inadmissible.

reasonable professional judgment supported the limitations on investigation. *Id.*; see also *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015).

Because, for the reasons discussed earlier, there was no valid legal basis to challenge Byrd's in-court identification of Posey, trial counsel was not ineffective for failing to object to the identification. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) (counsel is not ineffective for failing to raise a meritless argument or futile objection).

Posey also argues that trial counsel was ineffective for failing to call an eyewitness-identification expert at trial. While the identification of Posey as one of the shooters was an important issue at his trial, it was reasonable for trial counsel to attack the credibility and reliability of Byrd's in-court identification solely through cross-examination. Although it is possible an expert *may* have helped, one was not required. See *People v Pickens*, 446 Mich 298, 314; 521 NW2d 797 (1994) (the law requires a trial that is fair, not perfect). Trial counsel effectively challenged Byrd's identification testimony. In fact, without the use of an expert, the jury was made aware that Byrd admitted identifying someone other than Posey in a photo lineup the day after the shooting when his memory was fresh. Again, Byrd even admitted that at the time of the array, he actually could not identify the shooters. Instead, Byrd indicated that he relied on his subsequent viewing of the surveillance videos on a television news broadcast—not his personal recollection of the shooters—to identify defendants. Further, the jury was informed that at the preliminary examination Byrd could only identify Quinn as one of the perpetrators. Thus, hearing testimony from an expert that eyewitness testimony is inherently suspect would not have added much, considering that the jurors were made fully aware of Byrd's dubious history of identifying the shooters. Put another way, Byrd's failure to identify defendants as the shooters immediately after the shooting and his subsequent in-court identification of defendants illustrated firsthand that eyewitness testimony can be inherently suspect. No expert was needed to convey this point.

For the same reason, Posey fails to demonstrate a reasonable likelihood that the outcome of the proceedings would have been different had he obtained an expert witness at trial. Additionally, the prosecution presented surveillance video evidence and still frames showing the assailants. As a result, the jury may have completely disregarded Byrd's questionable identification testimony and instead relied on both the video and photographic evidence showing the shooters and the circumstantial evidence that Posey appeared at a hospital with gunshot wounds after the incident to determine that Posey was one of the gunmen. In sum, we hold that Posey's claims of ineffective assistance of counsel do not warrant reversal.

## B. SENTENCING AND PROPORTIONALITY

Posey argues that the trial court abused its discretion when it sentenced him to serve 22 to 40 years' imprisonment for his AWIM convictions. We disagree. "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). We review de novo constitutional challenges to sentencing decisions. See *People v Skinner*, 502 Mich 89, 99; 917 NW2d 292 (2018).

At his initial sentencing, Posey's guidelines range for his AWIM convictions was 225 to 562 months (or 18 years and 9 months to 46 years and 10 months), and the court sentenced him within that range to a minimum prison term of 22 years. After filing his claim of appeal in Docket No. 345491, Posey successfully moved to remand for resentencing. On remand, the trial court vacated Posey's convictions of AWIGBH and lowered his guidelines range to 171 to 427 months. The court, however, resentenced Posey to the same minimum prison term of 22 years, which was still well within the new guidelines range—more than 13 years below the top end of the range.

Posey argues that the minimum sentence is not proportionate because the court failed to take into consideration his rehabilitative potential and because the sentence was not decreased at resentencing despite the decrease in and lowering of the guidelines range. "If a minimum sentence is within the appropriate guidelines sentence range, the court of appeals shall affirm that sentence and shall not remand for resentencing absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence." MCL 769.34(10). In this case, Posey's minimum sentence of 22 years falls within the applicable guidelines range, and he does not challenge the scoring of the guidelines or the accuracy of the information used by the court in sentencing Posey.

Posey argues that MCL 769.34(10) is no longer good law in light of our Supreme Court's decision in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015). In *Lockridge*, the Supreme Court held that Michigan's sentencing guidelines violated the Sixth Amendment right to a jury trial, and it remedied the constitutional infringement by declaring the guidelines advisory only. *Id.* at 364-365. In *People v Schrauben*, 314 Mich App 181, 196 n 1; 886 NW2d 173 (2016), this Court held that the decision in "*Lockridge* did not alter or diminish MCL 769.34(10)." Therefore, "[w]hen a trial court does not depart from the recommended minimum sentencing range, the minimum sentence must be affirmed unless there was an error in scoring or the trial court relied on inaccurate information." *Schrauben*, 314 Mich App at 196. Posey acknowledges *Schrauben*, argues that it was wrongly decided in violation of *Lockridge* and the Sixth Amendment, and asks us to declare a conflict and request the convening of a special panel under MCR 7.215(J)(2)-(3).

In *People v Ames*, 501 Mich 1026 (2018), our Supreme Court entered an order granting oral argument on whether to grant leave to appeal and directed as follows:

> The appellant shall file a supplemental brief within 42 days of the date of this order addressing whether MCL 769.34(10) has been rendered invalid by this Court's decision in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), to the extent that the statute requires the Court of Appeals to affirm sentences that fall within the applicable guidelines range "absent an error in scoring the sentencing guidelines or inaccurate information relied upon in determining the defendant's sentence." See *People v Schrauben* . . . .

The Supreme Court heard oral arguments on January 24, 2019, and then later unanimously denied leave because the Court was "not persuaded that the questions presented should be reviewed[.]"

-8-

*People v Ames*, 504 Mich 899 (2019). While not binding precedent,[5] the order in *Ames* appears to signal the Supreme Court's acceptance of *Schrauben.* Moreover, this Court has been relying on the construction of MCL 769.34(10) set forth in *Schrauben*, including in binding published opinions. See *People v Anderson*, 322 Mich App 622, 615-616; 912 NW2d 607 (2018) (citing *Schrauben* in support of its ruling that "[b]ecause the trial court sentenced Anderson within the applicable sentencing guidelines range, this Court need not evaluate Anderson's sentences for reasonableness and must affirm his sentences . . . ."). Under these circumstances, and because we believe that the *Schrauben* panel was correct in its analysis, we decline to declare a conflict with *Schrauben* under MCR 7.215(J)(2)-(3).

Additionally, defendant is simply mistaken that a sentence within the guidelines is unassailable absent a scoring error or inaccurate information. MCL 769.34(10) does not and cannot preclude *constitutional* appellate challenges to a sentence, e.g., an argument that a sentence constitutes cruel and unusual punishment. See *People v Powell*, 278 Mich App 318, 323; 750 NW2d 607 (2008) (MCL 769.34[10]'s limitation on review does not apply to claims of constitutional error); see also *People v Conley*, 270 Mich App 301, 316; 715 NW2d 377 (2006) ("It is axiomatic that a statutory provision, such as MCL 769.34[10], cannot authorize action in violation of the federal or state constitutions.").

We note that grossly disproportionate sentences may constitute cruel and unusual punishment. *People v Bullock*, 440 Mich 15, 32; 485 NW2d 866 (1992). However, there is a distinction between "proportionality" as it relates to the constitutional protection against cruel and unusual punishment, and "proportionality" as it relates to reasonableness review of a sentence, which is not constitutional in nature. *Id.* at 34 n 17 ("Because the similarity in terminology may create confusion, we note that the constitutional concept of 'proportionality' under Const 1963, art 1, § 16 [cruel or unusual punishment prohibition] is distinct from the nonconstitutional 'principle of proportionality' discussed in . . . *Milbourn* . . ., although the concepts share common roots."). A sentence within the guidelines range is presumptively proportionate, and a proportionate sentence is not cruel or unusual punishment. *Powell*, 278 Mich App 318, 323. A defendant can only overcome the presumption by presenting unusual circumstances that would render a presumptively proportionate sentence disproportionate. *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). No unusual circumstances were presented here, and the AWIM sentences were not disproportionate. Indeed, we conclude that the 22-year minimum sentence was proportionate to the seriousness of the circumstances surrounding the offense and the offender. *Steanhouse*, 500 Mich at 459-460. In this case, defendant does not argue that his AWIM sentences constitute cruel or unusual punishment, and we conclude in any event that because the sentences were presumptively proportionate, devoid of unusual circumstances, proportionate under *Milbourn*, and certainly not grossly disproportionate, they did not constitute cruel or unusual punishment.

Because MCL 769.34(10) precludes appellate review of Posey's AWIM sentences and he does not raise a viable constitutional challenge to the sentences, we affirm those sentences.

---

[5] See *Tebo v Havlik*, 418 Mich 350, 363 n 2; 343 NW2d 181 (1984) ("A denial of leave to appeal has no precedential value.").

## III. DOCKET NO. 346039 – DEFENDANT QUINN

### A. DUE PROCESS AND IN-COURT IDENTIFICATION

Quinn argues that he was denied due process by a suggestive identification process. But as with the argument presented by Posey, there was no pretrial identification of Quinn by Scott or Byrd and thus no suggestive out-of-court identification. Byrd's identification of Quinn in court was properly left for the jury to assess. Accordingly, Quinn's argument fails. See *Perry*, 565 US at 231-233; *Barclay*, 208 Mich App at 675-676. Moreover, Quinn made a statement to the police in which he admitted being present at the crime scene, and his attorney conceded that point in counsel's arguments to the jury. Any error on this unpreserved issue would have been completely harmless and nonprejudicial. *Carines*, 460 Mich at 763.

### B. SUFFICIENCY OF THE EVIDENCE

Quinn next argues that there was insufficient evidence to support his AWIGBH convictions. The argument is cursory, vague, and disjointed. In *People v Kenny*, __ Mich App __, __; __ NW2d __ (2020); slip op at 5, this Court observed:

> This Court reviews de novo the issue regarding whether there was sufficient evidence to support a conviction. In reviewing the sufficiency of the evidence, this Court must view the evidence—whether direct or circumstantial—in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. Circumstantial evidence and any reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime. The prosecution need not negate every reasonable theory of innocence, it but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. All conflicts in the evidence must be resolved in favor of the prosecution. [Quotation marks and citations omitted.]

Quinn first appears to argue that the evidence was insufficient to establish Quinn's presence at the crime scene. "[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). Quinn's statement to police placed him at the crime scene. Also, defense counsel conceded that Quinn was present at the shooting. And Byrd's in-court identification indicated that Quinn was at the crime scene. Also, Quinn went to the hospital after the shooting suffering from gunshot wounds. There was not only sufficient evidence that Quinn was present at the shooting, there was overwhelming evidence.

Next, Quinn essentially contends that there was insufficient evidence to show that he instigated or started the shooting or that he even discharged his weapon before Byrd, who was not injured, opened fire. Thus, according to Quinn, there was no attempt to injure Byrd or Scott and no intent to cause great bodily harm.

In *People v Stevens*, 306 Mich App 620, 628-629; 858 NW2d 98 (2014), this Court addressed the offense of AWIGBH, stating:

> The elements of AWIGBH are (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder. AWIGBH is a specific intent crime. The intent to do great bodily harm less than murder is an intent to do serious injury of an aggravated nature. If a defendant has such intent, the fact that he was provoked or that he acted in the heat of passion is irrelevant to a conviction. Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent. Intent to cause serious harm can be inferred from the defendant's actions, including the use of a dangerous weapon or the making of threats. Although actual injury to the victim is not an element of the crime, injuries suffered by the victim may also be indicative of a defendant's intent. [Quotation marks and citations omitted.]

In Quinn's interview with police, after initially lying about whether he was present at the Super X Market, Quinn admitted to being at the market, admitted that he was with someone who intended to rob two individuals near the Trailblazer outside the market, and admitted that he produced his gun after exiting the market. There was also evidence showing, contrary to Quinn's assertions in his statement to the police, that Quinn had his firearm drawn and pointed at Byrd *before* Byrd responded by pulling out his own firearm. To the extent that Quinn is suggesting that if Byrd fired first, it would make Quinn's subsequent discharge of his weapon justifiable, i.e., self-defense, we find that argument without merit. Quinn did not raise any issue of self-defense, and the jury was not instructed on self-defense. Moreover, in light of the evidence that Quinn was the aggressor, any claim of self-defense would not have been sustainable. See *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013) ("In general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor.").

Furthermore, the jury could reasonably infer that Quinn had the intent to cause serious injury of an aggravated nature in light of his use of a dangerous weapon. *Stevens*, 306 Mich App at 629. As this Court has explained, "[m]erely pointing a loaded gun at another person is inherently dangerous; the notion that actually shooting a gun in the direction of another person, no matter how inaccurately, could reflect anything but an intent to cause serious harm is beyond comprehension." *People v Blevins*, 314 Mich App 339, 358; 886 NW2d 456 (2016) (emphasis omitted). Additionally, Quinn cannot rely on the fact that Byrd testified that he never saw Quinn fire his weapon. The person Byrd identified as Quinn left his gun behind at the scene. The retrieved gun had a spent casing that apparently had become jammed or stuck inside the weapon. From this evidence, the jury could have reasonably inferred that Quinn fired his gun. Moreover, the jury was instructed on aiding and abetting, and there was evidence that Posey and Quinn were working together to commit a robbery and that Posey fired his gun multiple times in the gunfight melee that erupted at the market. See MCL 767.39 ("Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense."); *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (aiding and abetting is a theory of prosecution that allows the imposition of vicarious liability for accomplices). Although vacated presumably on double jeopardy grounds,

Posey was convicted of two counts of AWIGBH by the jury. Thus, the jury certainly could have determined that Quinn—Posey's accomplice—was guilty of two counts of AWIGBH on an aiding and abetting theory even if Quinn did not have a chance to discharge his weapon before being shot.

In sum, we hold that Quinn's argument that there was insufficient evidence to support his AWIGBH convictions fails. Reversal is unwarranted.

## C. IMPOSITION OF COURT COSTS

Quinn argues that remand is necessary because the trial court did not explain the factual basis for its imposition of $1,300 in court costs as required under MCL 769.1k(1)(b)(*iii*) (court can impose "any cost reasonably related to the actual costs incurred by the trial court without separately calculating those costs involved in the particular case"), and this Court's decision in *People v Konopka (On Remand)*, 309 Mich App 345, 360; 869 NW2d 651 (2015) ("We . . . remand to the trial court for it to establish a factual basis for the $500 in costs imposed under MCL 769.1k[1][b][*iii*], or to alter that figure, if appropriate."). The trial court imposed the $1,300 in court costs without explanation. But Quinn did not preserve this issue with an objection; therefore, our review is for plain error affecting Quinn's substantial rights. *Carines*, 460 Mich at 763.

The prosecutor has supplied us with a document from the State Court Administrative Office (SCAO) reflecting that the average cost per criminal case in the Wayne Circuit Court is $1,302.[6] Furthermore, during defendant Posey's resentencing, he was assessed $1,300 in court costs as well. And at that time, the trial court explained that the $1,300 figure "has been arrived at as an average cost of processing cases through the Wayne County Circuit Court by the [SCAO]." Although this remark pertained to Posey and not Quinn, it reveals the trial court's reliance on the SCAO calculation for the imposition of $1,300 in court costs. While *Konopka* would ordinarily call for a remand, we decline to do so under the present circumstances. *Konopka*, 309 Mich App at 360. Quinn does not even present an argument under the prejudice prong of the plain-error test. Accordingly, although the trial court plainly erred by failing to articulate the factual basis for the court costs imposed against Quinn, Quinn has not demonstrated any of the requisite "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

Quinn argues that he was denied the effective assistance of counsel during trial in two particular instances. Quinn first asserts that counsel was ineffective for failing to move to suppress his statements to the police. On the day of the shooting, Quinn was taken to Henry Ford Hospital after he was shot, and he had surgery that same day. The following day, the police interviewed Quinn at the hospital. The interview was recorded and admitted into evidence. Quinn maintains that as a result of his postsurgery condition, his statements were not voluntary and thus inadmissible. Quinn primarily relies on the fact that he was physically injured and on pain medication at the time of the interview.

---

[6] We exercise our power under MCR 7.216(A)(4) to "permit . . . additions to the . . . record" and will consider the SCAO document.

It is well established that voluntary statements are admissible, while involuntary statements are not. *People v Robinson*, 386 Mich 551, 557; 194 NW2d 709 (1972). In *People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988), the Michigan Supreme Court set forth the analysis governing a determination whether a defendant's statements or confession was voluntary:

> The test of voluntariness should be whether, considering the totality of all the surrounding circumstances, the confession is "the product of an essentially free and unconstrained choice by its maker," or whether the accused's "will has been overborne and his capacity for self-determination critically impaired . . . ." The line of demarcation "is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. [Citations omitted.]

Again, Quinn focuses solely on his injuries and the medication he was taking to support his claim of involuntariness. All of the other factors appear to support a conclusion that Quinn's statements to the police were voluntary. Quinn was 29 years old at the time; he had a GED, and he could read and write. Quinn's status as a third-offense habitual offender indicates that he had prior experience with the police. The questioning lasted less than 25 minutes, of which, more than six minutes were dedicated to discussing Quinn's personal information and obtaining a *Miranda*[7] waiver. There is no suggestion that Quinn had been deprived of food, sleep, or medical attention, and there is no evidence that Quinn was abused or threatened with any abuse.

Furthermore, assuming that Quinn was experiencing some pain from his injuries and was affected by his pain medication, we still have no indication that his condition was so debilitating as to make him lose his free will. In our review of the interview, Quinn appears alert and articulate the entire time, with no sign that he was impaired by any medication during the interview. Consequently, Quinn's reliance on *Mincey v Arizona*, 437 US 385; 98 S Ct 2408; 57 L Ed 2d 290 (1978), is misplaced. In *Mincey*, the defendant had been seriously wounded; he was severely

---

[7] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

depressed; he was still in the intensive care unit when interviewed, he described leg pain that was unbearable; he was quite confused; some of his written answers were incoherent; he was using a breathing apparatus reserved for more critical patients; he had made several ignored requests for the questioning to cease, and the interrogating officer only stopped the interview at points when the defendant lost consciousness or received medical treatment. *Id.* at 398-401.

The video of Quinn's interview shows a markedly different situation. Quinn never asked to stop the questioning; he was alert and conscious the whole time, and his physical condition was nowhere near as severe as the defendant's condition in *Mincey*. In sum, there is no evidence that Quinn's mental condition was significantly compromised or diminished. Indeed, he was alert, responsive, and articulate during the interview.

It is also important to recall that Quinn initially lied to police. When a detective asked him about the circumstances surrounding his getting shot, Quinn first stated that he had been shot by someone named "John Boy" at a tire store, possibly near Dequindre Road. Quinn claimed that he was trying to buy some rims. The detective then asked Quinn if he were sure about that story, and Quinn replied, "I'm positive." When the detective said that he had seen a video showing Quinn at the Super X Market, Quinn changed his story and admitted to being at the market. Quinn also admitted to being present with "D" at the market and that "D" wanted to rob two individuals who were outside standing next to a Trailblazer. Although Quinn initially denied having a gun that day, he later admitted to having a firearm and wielding it after leaving the market. Quinn explained that the "gunplay started" right after he walked out of the Super X Market. Quinn maintained that he only pulled out his gun after seeing other weapons being displayed, and Quinn continued to deny having ever fired his gun. Quinn's initial fabrications belie his claim that his statements were involuntary. If the circumstances in the interview were such that Quinn had lost his free will, he would not have been able to fabricate a story in an attempt to clear himself of any criminal wrongdoing. See *DeJesus v State*, 655 A2d 1180, 1198 (Del, 1995) (stating that the defendant's "exculpatory statements at the hospital serve to undermine his claim of coercion" and involuntariness). The video shows that Quinn finally relented with his falsehoods, for the most part, when he was informed that the detective had clearly seen him in the video.

Furthermore, in *Colorado v Connelly*, 479 US 157, 163-164; 107 S Ct 515; 93 L Ed 2d 473 (1986), the United States Supreme Court spoke to the issue of voluntariness as part of due process analysis, explaining:

> [T]he cases considered by this Court over the 50 years since *Brown v Mississippi*[, 297 US 278; 56 S Ct 461; 80 L Ed 682 (1936),] have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart

from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness." [Citation omitted.]

Here, there is simply no evidence to indicate or suggest that there was any police coercion whatsoever in obtaining Quinn's statements. Therefore, there was no due process violation.

For these reasons, any motion to suppress Quinn's statements on the basis that they were involuntary would not have been successful. The totality of the circumstances established that Quinn's statements were voluntary. Accordingly, defense counsel was not ineffective for failing to pursue a meritless or futile motion to suppress. See *Ericksen*, 288 Mich App at 201.

Quinn also argues that counsel was ineffective for failing to obtain a DNA expert. This claim lacks merit. There is nothing in the lower court record suggesting that a DNA expert could have discovered anything of relevance. With nothing in the record to support Quinn's position that DNA testing would have been helpful, he cannot prevail on this issue. See *Carbin*, 463 Mich at 600 (stating that a defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel). There simply is no basis for concluding that any DNA testing would have exonerated Quinn.

## IV. CONCLUSION

In Docket Nos. 345491 and 351834, we affirm Posey's convictions and sentences. In Docket No. 346039, we likewise affirm Quinn's convictions and sentences.

We affirm.

/s/ Jane E. Markey
/s/ Mark T. Boonstra
/s/ Karen M. Fort Hood

-15-